[No. S016890. Dec. 2, 1991.]

DONALD PAUL CHRISTENSEN et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PASADENA CREMATORIUM OF ALTADENA et al., Real Parties in
Interest.

872

**COUNSEL**

Robie & Matthai, Edith R. Matthai, Pamela E. Dunn, Lieff, Cabraser & Heimann, Elizabeth Joan Cabraser, William Bernstein, William M. Audet, Kronick, Moskovitz, Tiedemann & Girard, William A. Kershaw, Robin Leslie Stewart, Michael McShane, Belli, Belli, Brown, Monzione, Fabbro & Zakaria, Melvin M. Belli, Sr., Richard Brown, Wilner, Narwitz, Lewin & Klein, Wilner, Klein, Siegel & Kehr, Walter Klein, Sayre, Moreno, Purcell & Boucher and Gilbert S. Purcell for Petitioners.

No appearance for Respondent.

Marlin & Saltzman, Marlin, Saltzman & White, Louis M. Marlin, Stanley D. Saltzman, Morris, Polich & Purdy, Jeffrey S. Barron, Robert S. Wolfe, Anthony G. Brazil, Douglas J. Collodel, Michael S. Wildermuth, Donald L. Ridge, Adams, Duque & Hazeltine, Richard T. Davis, Jr., Jeffrey P. Smith, Berna Warner-Fredman, F. Christopher Chrisbens, Pillsbury, Madison & Sutro, C. Douglas Floyd, F. John Nyhan, Anthony R. Delling, Susan A. Kerans, Gerber & Donaldes, Harvey R. Gerber, Berchin & Berchin, Eugene C. Berchin and Jerome J. Berchin for Real Parties in Interest.

Horvitz & Levy, Barry R. Levy, Christina J. Imre, Fred Main, Catherine I. Hansen, Fred J. Hiestand and Richard Denhalter, City Attorney (Santa Clara), as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**BAXTER, J.**—We are asked to decide whether persons other than those who contract for the services of mortuaries and crematoria or have the statutory right to direct the disposition of the body of a decedent may recover damages for emotional distress engendered by knowledge of the negligent or intentional mishandling of the decedent's remains when they did not observe the misconduct or its consequences. The Court of Appeal held that those family members may recover damages for the emotional distress they suffer if remains are negligently or intentionally mishandled, and that if the mishandling is intentional all family members and close friends of the deceased may do so.

We agree that the class of persons who may recover for emotional distress negligently caused by the defendants is not limited to those who have the statutory right to control disposition of the remains and those who contract for disposition. The class is not, however, as expansive as that identified by the Court of Appeal. As in all recovery for negligence, the potential plaintiff must be a person to whom the defendant owes a duty recognized by the law. In this context, the duty is owed only to those close family members who were aware that funeral and/or crematory services were being performed, and on whose behalf or for whose benefit the services were rendered.

Therefore, and because we also conclude that the individual plaintiffs and the class they seek to represent lack standing to recover on an intentional infliction of emotional distress theory, the judgment of the Court of Appeal must be modified.

I

This matter arises on review of a ruling on standing to sue made by the trial court in a coordination proceeding.[1] At the trial court's request the parties briefed the question of standing based on the allegations of a designated "model" complaint, selected for the purpose of preliminary rulings from those filed in the coordinated actions. The Court of Appeal treated the ruling as one in the nature of a ruling on a demurrer,[2] accepting the allegations of the model complaint as true for purposes of this proceeding, and considering whether those allegations stated a cause of action on behalf of all of the individual plaintiffs, and the class the individual plaintiffs sought to represent.[3]

In response to plaintiffs' petition for writ of mandate, after issuance of an alternative writ the Court of Appeal directed that a peremptory writ issue to compel the trial court to modify its order to recognize the standing of additional plaintiffs.

We agree with the Court of Appeal that the ruling, although described as one on standing, was in the nature of a ruling on a demurrer inasmuch as the effect was to determine whether all of the plaintiffs and the plaintiff class had stated a cause or causes of action for which each could recover emotional distress damages. We address the issues as having been raised in that context.

The model complaint defined the plaintiff class as one consisting of surviving spouses, relatives, and designated representatives of decedents whose remains had been mishandled by defendants. The individual plaintiffs who seek to represent the class are persons within the class who have the right and responsibility for handling, and the right to custody and possession of their decedents' remains, and possess or may acquire the right under section 7100 of the Health and Safety Code[4] to control disposition of the

---

[1]See California Rules of Court, rule 1501 et seq., and in particular rule 1541(a)(4).

[2]The model complaint is the second amended complaint. A proposed fourth amended complaint (PFAC), which has not been filed because proceedings below are stayed, was also considered by the Court of Appeal in the interests of judicial economy.

[3]The action has not yet been certified as a class action. The trial court's request for briefing on the question of standing appears to have been made in anticipation of that ruling.

[4]Unless otherwise indicated, all statutory references are to the Health and Safety Code. Persons claiming rights under section 7100 are referred to occasionally as "statutory right holders."

remains, and/or contracted for defendants' services, paid for the services, or represent the estates of persons who did so.[5]

All of the individual plaintiffs and members of the plaintiff class as described in the model complaint are, therefore, contracting parties and/or relatives of decedents whose remains were allegedly mishandled.[6]

The defendants fall into two principal classes designated by plaintiffs as the "mortuary" defendants and the "crematory" defendants. The mortuary defendants allegedly undertook to, contracted to, and agreed to provide funeral-related services for the benefit of plaintiffs, and to accomplish the cremation of the remains of plaintiffs' decedents "with the dignity and respect due them in accordance with Plaintiffs' and decedents' wishes, in keeping with public sensibilities, and in accordance with the law." The mortuary defendants contracted with the crematory defendants for cremation of the remains.

The crematory defendants, which represented that they would perform cremations in a dignified and respectful manner, provided forms authorizing

---

[5]The model complaint alleges that the plaintiff class consists of at least 6,050 members. Defendants state that the 15 coordinated lawsuits allege misconduct in the disposition of 16,500 decedents, thus creating a potential class of much greater magnitude.

[6]The standing of friends of the decedents to sue for emotional distress suffered as a result of intentional mishandling of remains was not raised in the trial court by the allegations of the model complaint, and thus was not within the scope of the alternative writ issued by the Court of Appeal to review the trial court order. Plaintiffs proposed an amendment to the PFAC which would name as an individual plaintiff one person who is described as a friend of one decedent. The Court of Appeal held that plaintiffs could amend the complaint to name an aggrieved friend as a party.

The Court of Appeal may have addressed the issue because the petition for writ of mandamus related to a ruling in a coordination proceeding. Rule 1505 of the California Rules of Court recognizes that writ review may be sought of orders in coordination proceedings. No special rules govern appellate review of rulings in coordination proceedings, but the Court of Appeal's willingness to anticipate and dispose of issues that might arise on the filing of amended complaints subsequent to disposition of the writ proceeding comports with the purpose of coordination of civil actions, which includes the efficient use of judicial resources. (Code Civ. Proc., § 404.1.)

Consideration of the PFAC was appropriate for that reason. The PFAC adds as named plaintiffs individuals who are representatives of the various classes and subclasses identified in the complaint. The Court of Appeal permitted amendment of the petition for writ of mandate, which had initially sought relief on behalf of an unidentified class of persons denied relief by virtue of the trial court order on standing, to identify the petitioners by name.

We therefore reject that claim made by some crematory defendants that the mandate petitioners are unidentified persons who cannot establish that they have a beneficial interest in the subject matter of the petition. (Code Civ. Proc., § 1086; *Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].)

Our disposition of other issues makes unnecessary the consideration of defendants' argument that the ruling on the standing of friends was error.

cremation to the mortuary defendants to enable the latter to obtain consent from the next of kin whose business the mortuary defendants solicited on behalf of both themselves and the crematory defendants.

The mortuary defendants knew, or should have known, of the illegal and improper practices of the crematory defendants.

The remaining defendants, Carolina Biological Supply Company and its agent William G. Gabriel, residents of North Carolina (collectively, the Carolina defendants), allegedly requested and purchased human organs and body parts from the crematory defendants. The Carolina defendants failed to seek review of an earlier order of the trial court overruling their demurrer, and did not seek review of the Court of Appeal ruling on the standing of a subclass of plaintiffs who seek recovery from the Carolina defendants. In that ruling, the Court of Appeal held that only the statutory right holders may recover from the Carolina defendants that, allegedly, purchased bodily organs and parts taken from plaintiffs' decedents by the crematory defendants, and did so under circumstances in which the Carolina defendants knew or should have known that desecration of human remains would necessarily occur.[7]

The PFAC seeks relief against members of each class directly and for the acts of others on theories of agency and conspiracy. The events about which plaintiffs complain occurred in the period 1980-1987, but were not discovered by plaintiffs until February 1987, when plaintiffs first learned "from public media reports" that their decedents' remains had been mishandled in the manner alleged in the complaint.

The model complaint alleged that the crematory defendants mishandled and mutilated remains, commingled human remains, and violated sections 7051, 7052, 7054.7, and 7055, as well as Business and Professions Code section 7735, and Penal Code section 487.1.

---

[7]Although neither Carolina Biological Supply Company nor Gabriel petitioned for review, and plaintiffs did not identify this ruling as an additional issue for review in their answer to the petitions for review by the other defendants, Carolina Biological Supply Company has been permitted to file a brief on the merits in this proceeding. (See *Woods* v. *Young* (1991) 53 Cal.3d 315, 333 [279 Cal.Rptr. 613, 807 P.2d 455], conc. opn. of Baxter, J.) Gabriel has not appeared in this court. The company argues that it is sued only on a theory that it negligently failed to discover the misconduct of the other defendants. The complaint refutes that claim, however. It alleges statutory violations, and seeks to hold all defendants liable on agency theories of recovery.

More specifically, in support of this allegation and one charging that those defendants had "removed and 'harvested,' without authorization or permission, numerous human organs and body parts from plaintiffs' decedents' remains," the complaint alleged that defendants cremated remains in the pottery kiln of defendant Oscar Ceramics; cremated remains in a disrespectful manner; cremated as many as 10 to 15 bodies together at the pottery kiln and multiple bodies at other locations; took and sold gold and other metals from the remains; placed cremated remains in urns or other containers without preserving their integrity or identity; and mutilated decedents' remains "including, but not limited to the unauthorized taking of Plaintiffs' decedents' corneas, eyes, hearts, lungs and other organs, and bones and body parts, which were sold for Defendants' profit . . . ."

The mortuary defendants, who had agreed to provide funeral-related services and accomplish cremation of the remains for the benefit of plaintiffs, had contracted with the crematory defendants for services in circumstances in which they knew or should have known that this conduct was occurring or would occur.

On discovering defendants' misconduct plaintiffs suffered and will continue to suffer "physical injury, shock, outrage, extreme anxiety, worry, mortification, embarrassment, humiliation, distress, grief, and sorrow."

The ninth cause of action, identified as one for "Intentional Interference with Remains and Infliction of Emotional Distress," alleged that the crematory and mortuary defendants had wilfully and deliberately interfered with the rights and duties of the plaintiffs to effect the proper cremation of the remains "by mutilating the remains by 'harvesting' of organs and body parts, by performing multiple cremations, by commingling decedents' cremated remains with other cremated remains, and with nonhuman residue, and by unceremoniously and disrespectfully handling Plaintiff's decedents' remains, rather than by separately, respectfully, and with dignity, mishandling the cremated remains . . . ." As a result plaintiffs allegedly suffered injury like that described above.

The 10th cause of action, identified as one for "Negligent Interference with Remains and Infliction of Emotional Distress," alleged the same improper conduct and injury caused by defendants' negligent, reckless and careless interference with the plaintiffs' statutory rights and responsibilities to dispose of the remains of their decedents. This count also alleged that defendants had cremated, handled, and treated their decedents' remains in

ways unauthorized by plaintiffs and their decedents, which were contrary to their wishes, requests, and beliefs. Such negligent interference was accomplished through the common course and practice of unauthorized mutilation, improper cremation and commingling of remains. Negligent entrustment of the remains to persons unqualified to handle them was also alleged.[8]

Citing *Cohen* v. *Groman Mortuary, Inc.* (1964) 231 Cal.App.2d 1 [41 Cal.Rptr. 481], and *Sinai Temple* v. *Kaplan* (1976) 54 Cal.App.3d 1103 [127 Cal.Rptr. 80], as controlling, the trial court ruled that only those plaintiffs who were entitled by section 7100 to control the disposition of their decedents' remains as of the date of the decedents' death, or who actually contracted for disposition, had standing to assert the claims set forth in the model complaint.

II

Section 7100 establishes rights and duties in the disposition of human remains, providing:

"The right to control the disposition of the remains of a deceased person, unless other directions have been given by the decedent, vests in, and the duty of interment and the liability for the reasonable cost of interment of such remains devolves upon the following in the order named:

"(a) The surviving spouse.

"(b) The surviving child or children of the decedent.

"(c) The surviving parent or parents of the decedent.

"(d) The person or persons respectively in the next degrees of kindred in the order named by the laws of California as entitled to succeed to the estate of the decedent.

---

[8]The remaining causes of action, none of which is directly at issue here except to the extent that the seventh cause of action for negligence overlapped or duplicated the tenth cause of action, sought declaratory and injunctive relief with respect to written and oral contracts, and sought damages for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud and deceit, negligent misrepresentation, and unfair business practices.

"(e) The public administrator when the deceased has sufficient assets.

". . . . . . . . . . . . . . . . . . . . . . . ."

Other statutory provisions relied on by plaintiffs and/or relevant to the claims made by plaintiffs include the following:

The person who has the section 7100 duty of interment is entitled to custody of the remains for that purpose, or if the remains are cremated for burial at sea. (§ 7102.)[9]

Pursuant to the version of the Uniform Anatomical Gift Act (§ 7150 et seq.) in effect when this case arose, an individual had the primary right to make, permit, or refuse to permit the making of an anatomical gift. (Former § 7151. See now § 7150.5.) It was and is a felony to remove any part of any human remains from the place deposited while awaiting interment with the intent to sell it, unless written permission is given by the person who holds the section 7100 right. (§ 7051. See also Pen. Code, § 367f.)[10]

Section 7054.7 prohibits multiple cremation of remains and commingling of remains without the written permission of the section 7100 right holder, making violation of its provisions a misdemeanor. Section 7055 makes it a misdemeanor to remove remains from one primary registration district to another, except in a funeral director's conveyance, without a permit by the local registrar.

III

Before considering the causes of action for negligent and intentional interference with remains, the Court of Appeal addressed the plaintiffs'

---

[9]The person who signs an authorization for interment also warrants the identity of the persons whose remains are to be interred. (§ 7110.) The person who buries cremated remains at sea must file a verified statement with the registrar of births and deaths stating, inter alia, the name of the deceased person. (§ 7117.)

[10]Legislation adopted in 1988 makes removal of dental gold or silver from remains without written permission a felony. (§ 7051.5.) The theft of other articles of value from a dead body may be either a felony or misdemeanor. (Pen. Code, § 642.)

standing to seek recovery on a theory that plaintiffs, or some of them, were third party beneficiaries of a contract for mortuary services. It concluded that a section 7100 right holder is the only express beneficiary of a contract for mortuary services, and that if the contracting party was not the section 7100 right holder, only the holder of that right may be seen as an intended beneficiary of the contract.[11] The section 7100 right did devolve according to the statutory scheme, however, if the holder at the date of the death of the decedent himself or herself died.

After considering this court's recent decisions in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], and *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278], the Court of Appeal held that none of the plaintiffs could recover on either a negligent infliction of emotional distress or an intentional infliction of emotional distress theory. The court also held, however, that the allegations of the complaint stated a cause of action for negligent mishandling of a corpse, as recognized in *Quesada* v. *Oak Hill Improvement Co.* (1989) 213 Cal.App.3d 596 [261 Cal.Rptr. 769], for which the close family members described in *Thing* and grandchildren may recover damages for emotional distress.[12] A broader class, all family members and close friends, could recover for emotional distress suffered as a result of the intentional mishandling of remains.

In reaching these conclusions, the Court of Appeal applied well-settled principles governing the tort of negligence. The court recognized, as had this court in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.*, *supra*, 48 Cal.3d 583, 588, that when damages are sought for negligently inflicted emotional distress, the tort is negligence regardless of the specific name that may be used to describe the tort, and that the elements of duty, breach of duty, causation and damages must be pleaded and proven.

The court reasoned that when a mortuary agrees to care for the remains of a decedent, a special relationship is created between the mortuary and the close family members of the decedent by virtue of the nature of the services the mortuary undertakes to perform. The mortuary's duty to properly dis-

[11]We express no view on this holding, but note that none of the contracts for mortuary services was set forth in the model complaint or attached to and incorporated by reference into the complaint. Our conclusions here regarding the nature of contracts for mortuary and crematory services may be inconsistent with those of the Court of Appeal on this point.

[12]The family members whose right to recover was confirmed in *Thing* were "relatives residing in the same household or parents, siblings, children, and grandparents of the victim." (*Thing* v. *La Chusa*, *supra*, 48 Cal.3d 644, 668, fn. 10.) Observing that the direct victim in *Thing* was a child, the Court of Appeal reasoned that we had overlooked the possibility that a grandchild who was a bystander witness might suffer equivalent mental distress, and held that grandchildren should also be considered close relatives.

charge its responsibility of caring for the decedent runs to all persons with whom it has that special relationship, not just to the person who actually contracts for the services. It is foreseeable that a breach of that duty may cause severe emotional distress to members of the bereaved family.[13]

In recognizing a broader class of persons entitled to recover for intentional mishandling of a corpse, the Court of Appeal relied on language in *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 315 [29 Cal.Rptr. 33, 379 P.2d 513], quoted with approval in *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 652-653, which distinguished the culpability and liability of intentional tortfeasors from that of those who are merely negligent:

"[T]he increased liability imposed on an intentional wrongdoer appears to reflect the psychological fact that solicitude for the interests of the actor weighs less in the balance as his [or her] moral guilt increases and the social utility of his [or her] conduct diminishes."

The Court of Appeal also reasoned, based on statements in *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, that when an intentional tort is alleged, and society seeks to both punish the wrongdoer and deter such conduct by others, the imposition of liability out of all proportion to a defendant's negligence is not a concern. Therefore it is not necessary to limit liability to as narrow a class as is the case when negligence is the cause of the injury. For that reason, no arbitrary limitation of recovery to persons in a close family relationship with the decedent was required when the defendant had intentionally mishandled a corpse. Close friends of the decedent need not be denied the right to recover.

## IV

### NEGLIGENCE

A. *Standing.*

██ Defendants contend that the right to recover for emotional distress caused by the mishandling of human remains should be limited to those members of the decedent's family who actually witness the negligent conduct. In order to avoid the creation of limitless liability out of proportion to a defendant's fault the line should be drawn, as it was in *Thing* v. *La Chusa,*

---

[13]The restriction of recovery from the Carolina defendants to statutory right holders followed from the conclusion of the Court of Appeal that no special relationship existed between plaintiffs and those defendants. Plaintiffs do not challenge that aspect of the decision.

*supra*, 48 Cal.3d 644, so as to restrict recovery to those persons who are able to establish a direct causal link between perception of the misconduct and the emotional distress they suffer. The Court of Appeal, they argue, has erroneously recognized a new tort—mishandling human remains—which is not so limited.

It is true, as defendants observe, that the tort with which we are concerned is negligence. ■ Negligent infliction of emotional distress is not an independent tort (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.*, *supra*, 48 Cal.3d 583, 588), nor is negligent mishandling of human remains.[14] Those names are, however, convenient terminology descriptive of the context in which the negligent conduct occurred. Nonetheless, recognition that the theory on which recovery is sought is negligence does not mean that the principles which governed our decision in *Thing* v. *La Chusa*, *supra*, 48 Cal.3d 644, compel a similar result here.

*Thing* and *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], addressed the question of duty in circumstances in which a plaintiff seeks to recover damages as a percipient witness to the injury of another. "[T]he *Dillon* principles represent but the means for resolving the duty question in the specific factual context of the 'bystander witness' scenario . . . ." (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra*, 48 Cal.3d 583, 589, fn. 4.) Moreover, the line of negligence decisions commencing with *Dillon* and culminating in *Thing* all arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general. The plaintiffs had not themselves been threatened with physical injury and their emotional distress did not arise out of fear for their own safety. They sought to recover for emotional distress suffered as a result of observing the negligently caused injury of another. It was foreseeable that such persons would suffer emotional distress, but because it was foreseeable that any person who observed the injury-producing event would suffer some emotional distress and the

---

[14]This common misunderstanding is reflected in the opinion of Justice Kennard. The misconduct alleged here was not as she suggests, "*negligent* mishandling of human remains." The crematory defendants' conduct toward the remains of plaintiffs' decedents was *intentional* and the concealment of that conduct was *intentional*. The negligence element in this case lies in causing emotional distress to the plaintiffs who discovered the misconduct. This misconduct is indisputably more blameworthy than negligence in the driving of a motor vehicle. The mortuary defendants' conduct may have been only negligent, but negligence on the scale alleged in this context is sufficiently egregious to warrant imposition of liability. We have no doubt that the trier of fact will be able to distinguish an occasional simple act of negligence in providing funeral-related services and to appropriately assess the degree of emotional harm suffered.

class of potential plaintiffs was limitless, the court undertook to define and circumscribe the class to whom the defendant owed a duty. (*Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 652; *Dillon* v. *Legg, supra,* 68 Cal.2d 728, 733-735.)

■ In determining liability for negligence, we begin always with the command of Civil Code section 1714, subdivision (a): "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself." In the absence of a statutory provision limiting this rule, exceptions to the general principle imposing liability for negligence are recognized only when clearly supported by public policy. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496.) *Amaya, Dillon,* and *Thing* reflect a public policy exception which limits the right of a bystander who did not suffer physical injury and was not threatened with such injury to recover damages for the emotional distress the bystander suffered as a result of witnessing negligent conduct which caused physical injury to a third person. If any and all bystanders who witnessed the injury-causing event were permitted to recover for ensuing emotional distress, the defendant's liability could be out of all proportion to the degree of fault. (*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 922-923 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]; *Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295, 315.) Public policy therefore justified a limitation on the statutory right to recover damages for the emotional distress injury.

We agree with defendants that public policy considerations are relevant in determining whether a particular plaintiff may recover damages for emotional distress. This is true, however, whenever a plaintiff asserts that the negligent conduct of another breached a duty owed to the plaintiff. ■ "The existence of duty is a question of law. (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 66-67 [271 P.2d 23].) '[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

"It is a fundamental proposition of tort law that one is liable for injuries caused by a failure to exercise reasonable care. We have said, however, that in considering the existence of 'duty' in a given case several factors require consideration including 'the foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral

blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].)

Application of these principles does not compel a conclusion that the limitations deemed appropriate in *Dillon* v. *Legg, supra,* and *Thing* v. *La Chusa, supra,* to limit recovery by bystanders should apply in other situations, and particularly in that presented here.

The unique context in which this dispute arises is relevant to its resolution. The model complaint alleges that the mortuary and crematory defendants undertook not simply to provide an expeditious disposal of the remains of plaintiffs' decedents as a means by which the holders of the statutory rights or the contracting party could fulfill an obligation imposed by the state. Rather, the mortuary defendants undertook to provide appropriate and dignified services of the type that bereaved family members normally anticipate. Those services are not limited to the conduct of, or facilitating the conduct of, ceremonial or funeral rites, but extend through arranging the commitment of the remains through burial or encryptment, or alternatively cremation and inurnment or other disposition of the ashes of the decedent for whose family the services were performed.[15] (*American Funeral Concepts* v. *Board of Funeral Directors & Embalmers* (1982) 136 Cal.App.3d 303, 306 [186 Cal.Rptr. 196] ["Funeral services" include "burial or cremation."].)

Moreover, the relationship between the family of a decedent and a provider of funeral-related services exists in major part for the purpose of relieving the bereaved relatives of the obligation to personally prepare the remains for burial or cremation. The responsibility is delegated to others because family members do not want to undertake or witness those prepa-

---

[15]By definition a funeral director is one who, inter alia, engages in: "Preparing for the transportation or burial or disposal, or directing and supervising for transportation or burial or disposal of dead human bodies." (Bus. & Prof. Code, § 7615.)

The term "funeral director" as defined in this section and "mortician" are used interchangeably, as are the terms "funeral establishment" (Bus. & Prof. Code, § 7616) and "mortuary." (See, e.g., *IFS Industries, Inc.* v. *Stephens* (1984) 159 Cal.App.3d 740 [205 Cal.Rptr. 915]; *Mount Vernon Memorial Park* v. *Board of Funeral Directors & Embalmers* (1978) 79 Cal.App.3d 874 [145 Cal.Rptr. 275]; *State Bd. of Funeral Directors* v. *Mortuary in Westminister Memorial Park* (1969) 271 Cal.App.2d 638 [76 Cal.Rptr. 832].)

Defendants may, of course, demonstrate during proceedings to certify the class, or at trial, that the contracts into which they entered for disposition of the remains of plaintiffs' decedents did not contemplate services of the type alleged in the complaint.

rations. Therefore, it would be the exceptional case in which any family member would observe misconduct of the type alleged in the complaint. In arguing that the right of persons who do not witness the misconduct or its consequences to recover for emotional distress be limited to the statutory right holder or contracting party, defendants and the concurring and dissenting opinion of Justice Kennard invite this court to create an immunity protecting them from liability for the serious emotional distress caused by such egregious, but clandestine, misconduct. This we decline to do. Were this approach adopted, the persons suffering the greatest harm might well be barred from recovering for their emotional distress while one much less affected would be permitted to recover.

It is apparent that the identity of the individual who actually contracts for mortuary or crematory services or holds the statutory right to dispose of the remains of a decedent is incidental, and is not a reliable indicator of the family members who may suffer the greatest emotional distress if the decedent's remains are mishandled. One of several children of the decedent may arrange for the services on behalf of all siblings, as well as a surviving spouse or parent of the decedent. If so, the crematory or mortuary assumes a duty to all of these family members. There is no reason to assume that the person who makes the arrangements is any more susceptible to emotional distress if the services are not competently performed than are the other family members. Indeed, in light of the emotional impact of the death of a close family member of the bereaved, it may be the relative least affected who is chosen by the family to represent them in arranging for funeral and related services.[16]

Contrary to the view of Justice Kennard, the services for which the statutory right holder or the family member contracts are rarely performed for the benefit of the contracting party alone. Recognition that mortuary services are performed for the benefit of family members other than the contracting party or holder of the statutory right is apparent in both past California decisions and those of other jurisdictions, as well as in the legal literature.[17] ▉ "Once a mortuary . . . undertakes to accept the care,

---

[16]See Leavitt, *The Funeral Director's Liability for Mental Anguish* (1964) 15 Hastings L.J. 464, 477, footnote 50, and *Jones* v. *Caine* (1961) 31 Misc.2d 942 [222 N.Y.S.2d 563].

[17]Leavitt, *op. cit. supra,* 15 Hastings L.J. at page 466, observes that funeral-related services are principally for the comfort of the living, having as their aim the consolation of the leading mourners. The expectations of the survivors, and "essence of the contract [is] a reasonable expectation of dignity, tranquility, and personal consolation." (*Id.* at p. 491.)

Numerous out-of-state decisions have permitted actions by close relatives other than statutory right holders and contracting parties to go forward against defendants who have mishandled the corpse of the plaintiffs' loved one. Some expressly recognize standing of these

custody and control of the remains, a duty of care must be found running to the members of decedent's bereaved family." (*Draper Mortuary* v. *Superior Court* (1982) 135 Cal.App.3d 533, 538 [185 Cal.Rptr. 396].) The *Draper* court, like the Court of Appeal in the instant case, recognized that by undertaking to provide mortuary services, the defendant had created a relationship between itself and the family of the decedent by virtue of which an affirmative duty arose to avoid harm to the family members. (135 Cal.App.3d at pp. 537-538.)

The Court of Appeal reached a similar conclusion in *Quesada* v. *Oak Hill Improvement Co., supra*, 213 Cal.App.3d 596, holding expressly that a sister and niece of the decedent who had not contracted for funeral services could recover for the emotional distress they suffered as a result of the defendant mortuary's negligence in the handling of the corpse of their decedent. There, as a result of defendants' negligence, the body of another person was prepared and buried notwithstanding the protestations of family members that the body was that of a stranger. The Court of Appeal recognized that the plaintiffs did not seek damages on a *Dillon* bystander-witness theory, but claimed to be foreseeable direct victims of the defendants' negligence. The duty identified by the court was the duty of a mortuary to the close relatives of a decedent to properly handle the corpse. The duty existed because it was clearly foreseeable that defendants' conduct might cause severe mental trauma to persons having a close relationship with the deceased.

Defendants rely, however, on *Cohen* v. *Groman Mortuary, Inc., supra*, 231 Cal.App.2d 1, and *Sinai Temple* v. *Kaplan, supra*, 54 Cal.App.3d 1103, which the *Quesada* court distinguished or declined to follow. In *Cohen* v. *Groman Mortuary, Inc., supra* (hereafter *Cohen*), the plaintiffs were the mother, two minor children, husband, married daughter, aunt, two brothers and a sister of the decedent. One brother and the sister arranged for the funeral service, during which the defendant mortuary negligently substituted the body of another for plaintiffs' decedent. The Court of Appeal held that if the grava-

other persons, others assume standing. (See *Carney* v. *Knollwood Cemetery Ass'n* (1986) 33 Ohio App.3d 31 [514 N.E.2d 430, 435] [direct blood descendant family members]; *Thompson* v. *Duncan Bros. Funeral Homes, Inc.* (1982) 116 Misc.2d 227 [455 N.Y.S.2d 324, 326] [next of kin]; *Baumann* v. *White* (N.Y.Sup.Ct.Spec.Term 1962) 234 N.Y.S.2d 272, 273 [next-of-kin plaintiffs]; *Burns* v. *Anchorage Funeral Chapel* (Alaska 1972) 495 P.2d 70 [next-of-kin plaintiffs]; *Sworski* v. *Simons* (1940) 208 Minn. 201, 205 [293 N.W. 309] [parents]; *Cercelli* v. *Wein* (1969) 60 Misc.2d 345 [303 N.Y.S.2d 316, 318] [next-of-kin plaintiffs]; *Papieves* v. *Lawrence* (1970) 437 Pa. 373 [263 A.2d 118, 121, 48 A.L.R.3d 233] [nearest relatives]; *Allinger* v. *Kell* (1981) 102 Mich. App. 798 [302 N.W.2d 576, 579], revd. in part 411 Mich. 1053 [309 N.W.2d 547] [parents]; *Golston* v. *Lincoln Cemetery, Inc.* (Mo.Ct.App. 1978) 573 S.W.2d 700, 710 [immediate family]; *Galvin* v. *McGilley Memorial Chapels* (Mo.Ct.App. 1987) 746 S.W.2d 588 [children]; *Strachan* v. *John F. Kennedy Memorial Hospital* (1988) 109 N.J. 523 [538 A.2d 346] [parents]; *Scarpaci* v. *Milwaukee County* (1980) 96 Wis.2d 663 [292 N.W.2d 816, 820, 18 A.L.R.4th 829] [family].)

men of the complaint is based on a contractual duty, the duty does not extend to family members other than the contracting party. The court also held that if the action was one in negligence, the defendant mortuary had not breached its duty to those plaintiffs who were not the holders of the statutory right to control disposition of the body.

The *Cohen* court (*supra*, 231 Cal.App.2d 1) based its decision on the failure of the plaintiffs to define a duty running to them or to describe a right on which their action was predicated. Relying in part on *Amaya v. Home Ice, Fuel & Supply Co.*, *supra*, 59 Cal.2d 295, which this court subsequently overruled (in *Dillon v. Legg*, *supra*, 68 Cal.2d 728), the Court of Appeal held that there was no right to recover for emotional distress suffered as a result of negligent conduct directed at another person. The court did not undertake an independent analysis of the nature of mortuary services or consider whether they are performed for the benefit of persons other than the contracting party or persons expressly identified as intended beneficiaries of the contract.

*Cohen*, *supra*, 231 Cal.App.2d 1, reflects an approach recognized in the Restatement Second of Torts, section 868, that liability for interference with dead bodies runs to the family member having the right to dispose of the remains. However, the statement of the rule is accompanied by a caveat that the authoring American Law Institute took no position on liability to other family members, and is accompanied by a comment noting that at that time the "technical basis of the cause of action [was] the interference with the exclusive right of control of the body . . . . In practice the technical right has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor." (Rest.2d Torts, § 868, com. a.)[18] Both the original Restatement position and *Cohen* are now inconsistent with more recent authority. Section 868 of the Restatement was changed after the *Cohen* decision. It now addresses liability for negligent and reckless, as well as intentional, conduct and no longer limits recovery to family members. (Rest.2d Torts (appen.) § 868, reporter's notes, p. 75.) To the extent that *Cohen* conflicts with our decision here, it is disapproved.

---

[18]In a comment to the caveat, the Restatement Second of Torts observes that as of the time it was published the plaintiff had been the person entitled to disposition of the body, and in the absence of a decision the American Law Institute expressed no opinion on whether under some circumstances other family members would have a cause of action for their own emotional distress. In an implicit criticism of the unrealistic limits for which defendants now argue, the comment states: "The outrageous mistreatment of a dead body in the presence of surviving relatives would appear to be a proper case for liability . . . . But even when the conduct of the defendant is merely negligent, it is difficult to conclude that a widow who has the technical right of disposition of the body but is not present on the scene should be entitled to recover, while a daughter who is present, but has no such right should not." (Rest.2d Torts, § 869, com. g., at p. 276.)

*Sinai Temple* v. *Kaplan, supra,* 54 Cal.App.3d 1103, on which the trial court relied in part, involved a different question, and does not support defendants. The issue was only whether the statutory right holder could state a cause of action against a person who usurped that right. The minor daughter of decedent sought damages from the father of the decedent, her grandfather, who had contracted for funeral and burial services, for an alleged interference with her statutory right to control the disposition of the decedent's remains. (§ 7100.)

The Court of Appeal held that an action would lie against a close relative, as well as a mortician or cemetery, for tortious interference with the statutory right to dispose of a decedent's remains, and that improper burial procedures which were contrary to the beliefs of the statutory right holder would constitute interference with that person's rights. (*Sinai Temple* v. *Kaplan, supra,* 54 Cal.App.3d at p. 1112.) That holding was not remarkable. "[T]he next of kin, while not in the full proprietary sense 'owning' the body of the deceased, have property rights in the body which will be protected, and for a violation of which they are entitled to indemnification." (*O'Donnell* v. *Slack* (1899) 123 Cal. 285, 289 [55 P. 906].)

The question of recovery for negligence in the performance of funeral and related services did not arise in *Sinai Temple* v. *Kaplan, supra,* 54 Cal.3d 1103. The daughter's cross-complaint did not allege facts to suggest that defendants had mishandled the corpse or that the daughter had suffered any injury as a result of the manner in which the cross-defendants had performed the funeral and related services. The rights of other relatives to seek damages for negligence in the performance of funeral and related services was not before the court.

When misconduct in the provision of funeral-related services occurs in secret and its consequences are not apparent to members of the decedent's family, permitting recovery for the emotional distress suffered by all close family members for whom mortuary services are performed when the misconduct comes to light, regardless of which family member held the statutory right or actually contracted for the services, should be allowed. Recognition of their cause of action is fully consistent with the contemporary principles discussed above by which the existence of a duty to avoid harm to a particular plaintiff is determined.

We recognized in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583, 590, that damages for severe emotional distress may be recovered "when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a special relationship between the two." Defendants

here assumed a duty to the close relatives of the decedents for whose benefit they were to provide funeral and/or related services. They thereby created a special relationship obligating them to perform those services in the dignified and respectful manner the bereaved expect of mortuary and crematory operators.[19] The existence of this duty distinguishes the negligence action pleaded here from those of the bystander-witnesses who were plaintiffs in *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, and *Dillon* v. *Legg, supra,* 68 Cal.2d 728.[20]

█ Tort recovery for breach of a duty arising out of a third party contract is also consistent with well-established California precedent. In *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], this court held that a notary who negligently prepared a will had assumed and breached a duty to an intended beneficiary. Notwithstanding the lack of privity, recovery of damages was allowed. "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.* at p. 650.) In *Biakanja* v. *Irving,* as here, a benefit to the plaintiff was the purpose of the contract and the damage was foreseeable. (See also *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 804 [157 Cal.Rptr. 407, 598 P.2d 60].)

█ Carolina Biological Supply Company (Carolina), which also contends that the *Thing* v. *La Chusa* and *Dillon* v. *Legg* limitations should apply, argues that even if this court disagrees with that claim, the statutory right holders lack standing to seek damages from it on a negligence theory because no special relationship existed between them.

We agree that Carolina, unlike the other defendants, did not assume any duty related to the delivery of funeral-related services. One theory on which it is sued, however, is that it negligently contracted for and purchased human organs from the crematory defendants under circumstances in which it knew

[19]We recognize that the statutory right holder has the exclusive right to control the disposition of the remains, and may do so in a manner offensive to other family members. (*Ross* v. *Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988, 993-944 [203 Cal.Rptr. 468, 42 A.L.R.4th 1049].) This does not preclude liability to those other family members for whose benefit the services were to be performed.

[20]Recognition that defendants assumed this duty to plaintiffs also refutes defendants' assertion that permitting recovery in the circumstances alleged here will afford greater protection to the dead than to the living.

or should have known that the crematories had not complied with the laws of this state, which prohibit removal and sale of human organs absent the consent of the decedent or the statutory right holder.[21] Plaintiffs do not seek to impute liability to Carolina for the negligence of the crematory defendants, but to hold Carolina liable on a theory that it encouraged or induced the unlawful conduct of the crematory defendants.

Negligence in procuring injury-producing conduct of another may subject the negligent actor to liability for that conduct. "*A*'s own wrong may have contributed in some way to the causing of harm to *C* through *B*'s wrongful conduct. *A* may have commanded or procured that very wrong." (5 Harper et al., The Law of Torts (2d ed. 1986) § 26.1, p. 3.) Where a defendant has induced another to act in circumstances under which it is foreseeable that the conduct will cause injury to a third party, liability is found.

This principle, recognized in section 302A of the Second Restatement of Torts,[22] underlies the decision of this court in *Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051 [232 Cal.Rptr. 528, 728 P.2d 1163]. There we held that a supermarket which negligently accused a customer of felonious conduct and summoned police, could foresee that the resulting police investigation and arrest of the innocent plaintiff would cause emotional distress for which the supermarket was liable. While the police conduct may have been wrongful, the defendant was a proximate cause of the injury. (*Id.* at pp. 1064, 1065.) "If the likelihood that a third person may react in a particular manner is a hazard which makes the actor negligent, such reaction whether innocent or negligent does not prevent the actor from being liable for the harm caused thereby." (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 47 [123 Cal.Rptr. 468, 539 P.2d 36] [duty to decedent killed in auto crash established by foreseeability that inviting members of radio audience to be first to arrive at location would encourage reckless driving]. See also, *Ditez* v. *Illinois Bell Telephone Co.* (1987) 154 Ill.App.3d 544 [507 N.E.2d 24, 26] [defendant liable for trespass if defendant knows that party with whom defendent contracts will enter another's land to perform contract without obtaining required consents]; *Clark* v. *Library of Congress* (D.C. Cir. 1984) 750 F.2d 89, 98 [242 App.D.C. 241] [inducing violation of plaintiff's civil rights].)

---

[21] At the time of the incidents alleged in the complaint, section 7151.5 (see now § 7151) established an order of priority of relatives entitled to make anatomical donations. The priority parallels that established by section 7100.

[22] Section 302 A of the Second Restatement of Torts: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person."

Section 302 B of the Second Restatement of Torts: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

The allegations of the PFAC may also allege, or might be amended to allege, liability on a joint enterprise theory. ■ The joint enterprise theory, while rarely invoked outside the automobile accident context, is also well established (see Prosser & Keeton, Torts (5th ed. 1984) § 72, p. 516-521) and recognized in this state as an exception to the general rule that imputed liability for the negligence of another will not be recognized.

"It is only where a person actually acts through another to accomplish his own ends that the law will or should impose such vicarious liability. Right of control over the other person is a test of the required relationship, but it is not itself the justification for imposing liability. Aside from such legal relationships as master and servant, principal and agent, etc., before the courts will find that the parties were joint adventurers there must be clear evidence of a community of interest in a common undertaking in which each participant has or exercises the right of equal or joint control and direction. [Citations.] A joint venture is sort of a mutual agency, akin to a limited partnership. [Citations.] It is not sufficient that the parties have certain plans in common, but the community of interest must be such that [each] is entitled to be heard in the control [of the enterprise]. [Citations.] Most of the cases indicate that the common interest must be of some business nature." (*Roberts* v. *Craig* (1954) 124 Cal.App.2d 202, 208 [268 P.2d 500, 43 A.L.R.2d 1146]. See also, *King* v. *Ladyman* (1978) 81 Cal.App.3d 837, 842-843 [146 Cal.Rptr. 782]; *DeSuza* v. *Andersack* (1976) 63 Cal.App.3d 694 [133 Cal.Rptr. 920]. See also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1008, pp. 399-400.)

■ We cannot say that it was not reasonably foreseeable to Carolina that its conduct in offering to buy substantial quantities of human organs and body parts from the crematory defendants would induce those defendants to obtain the organs and body parts in a manner that would cause extreme emotional distress to the section 7100 right holders. If, under the circumstances, Carolina should have foreseen that the crematory defendants would violate the law, then its conduct may be found to be negligent per se.

Section 7051 makes the unauthorized removal of a body part with the intent to sell it a felony. As we explain below, the statutes governing the disposition of human remains exist not only to ensure removal of dead bodies and protect public health, but also to prevent invasion of the religious, moral, and esthetic sensibilities of the survivors. These laws were enacted to prevent the type of harm alleged here to the statutory rights holders, and create a duty to those persons. (See 6 Witkin, Summary of Cal. Law, Torts, *supra*, §§ 820, 833, at pp. 173, 189.) Obtaining the consent of the statutory right holder to the removal for sale of body organs is an obligation

imposed by law, for the violation of which a civil action will lie. (Civ. Code, §§ 1427, 1428.) No contract or special relationship is necessary to the recognition of a duty to prevent the harm sought to be avoided by the statute.

Recognition of this rule is so well established that the common law doctrine of negligence per se, of which it is a part, has been codified in California as a rebuttable presumption of negligence. (Evid. Code, § 669.)[23] Whether Carolina by the terms of its contracts induced the unlawful conduct of the crematory defendants, or exercised joint control over the manner in which the crematory defendants removed organs and thus was engaged in a joint enterprise, and negligently failed to ensure that it was purchasing only organs removed for sale pursuant to California law, and thus was a proximate cause of the emotional distress suffered by plaintiffs, are factual questions to be decided in later proceedings. We hold here only that the statutory right holders have standing to seek damages from Carolina.

### B. Policy Considerations in Recognition of Duty.

The principles which guide the court in determining whether a duty exists fully support our conclusion that defendants owed a duty to the plaintiffs, who have standing in this case. .

#### 1. Foreseeability and certainty of injury in funeral-related services—mortuary and crematory defendants.

The mortuary and crematory defendants do not dispute the foreseeability that mishandling human remains in the manner alleged in the model complaint is likely to cause serious emotional distress to members of the decedent's immediate family regardless of whether they observe the actual negligent conduct or injury to the remains of their decedent.

Even in the context of an action for breach of contract, where recovery of damages solely for emotional distress resulting from a breach is not nor-

---

[23]Evidence Code section 669: "(a) The failure of a person to exercise due care is presumed if:
"(1) He violated a statute, ordinance, or regulation of a public entity;
"(2) The violation proximately caused death or injury to person or property;
"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and
"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.
". . . . . . . . . . . . . . . . . . . . . . . . . ."

mally allowed, the provision of services related to the disposition of human remains has been distinguished because of the unique nature of the services.

This court so held in *Chelini* v. *Nieri* (1948) 32 Cal.2d 480 [196 P.2d 915], where defendant mortician breached a contract to preserve the body of the plaintiff's mother. The court held that recovery for emotional distress, there accompanied by symptoms of physical illness, was permitted in that context because the contract was directly related to the comfort, happiness, or personal welfare of the plaintiff.

More recently, in *Allen* v. *Jones* (1980) 104 Cal.App.3d 207, 211 [163 Cal.Rptr. 445], e.g., the defendant operators of a mortuary contracted to ship the remains of plaintiff's decedent brother to another state. The remains were lost in transit. The Court of Appeal held that the contract was one which so affected the vital concerns of an individual that recovery for emotional distress was permitted, explaining:

"A contract whereby a mortician agrees to prepare a body for burial is one in which it is reasonably foreseeable that breach may cause mental anguish to the decedent's bereaved relations. 'One who prepares a human body for burial and conducts a funeral usually deals with the living in their most difficult and delicate moments . . . . The exhibition of callousness or indifference, the offer of insult and indignity, can, of course, inflict no injury on the dead, but they can visit agony akin to torture on the living. So true is this that the chief asset of a mortician and the most conspicuous element of his advertisement is his consideration for the afflicted. A decent respect for their feelings is implied in every contract for his services.' (*Fitzsimmons* v. *Olinger Mortuary Ass'n.* (1932) 91 Colo. 544 [17 P.2d 535, 536-537].)" In a similar vein, another court has stated: "The tenderest feelings of the human heart center around the remains of the dead. When the defendants contracted with plaintiff to inter the body of her deceased husband in a workmanlike manner they did so with the knowledge that she was the widow and would naturally and probably suffer mental anguish if they failed to fulfill their contractual obligation in the manner here charged. . . . . (*Lamm* v. *Shingleton* (1949) 231 N.C. 10 [55 S.E.2d 810, 813-814]; *Allen* v. *Jones, supra,* 104 Cal.App.3d 207, 211-212.)

In all of the reported cases called to our attention, however, the relatives who were permitted to recover for negligence in the conduct of funeral and/or related services were aware that the services were being performed, and were persons for whose benefit the defendants had undertaken to provide the services. Recognition that it is foreseeable that close relatives of the deceased may suffer severe emotional distress as a result of negligence in the manner in which the corpse of their decedent is handled

was in that context. Plaintiffs identify no case in which persons who were not contemporaneously aware of both the death of their close relative and the nature of the funeral-related services that were to be performed have been held to be foreseeable victims of negligence in the conduct of those services.

We agree, therefore, with defendants' observation that the potential plaintiffs who could seek damages under the decision of the Court of Appeal is not appropriately limited. Under that court's decision persons who were infants or even unborn at the time the funeral-related services were performed, and others who were unaware of either the death or the nature of the services performed, could sue long after the services were completed on learning of an impropriety in the disposition of the remains. It would be unreasonable to consider those persons to be among the close relatives for whom the funeral-related services were performed, and to impose liability to them upon defendants. They are not persons for whose benefit the defendants undertook to perform services and thus no duty was owed to them. They are not foreseeable victims of the misconduct alleged in the model complaint.

It is foreseeable, however, that close relatives who are aware that funeral-related services are to be undertaken, but who are unable to or do not want to observe the manner in which remains are prepared for burial or cremation, and thus do not observe the mistreatment of their decedent's remains, may suffer serious emotional distress on learning that the decedent's remains have been mistreated.

### 2. Moral blame.

Here, there is no question but that the conduct of the crematory defendants, and that of the mortuary and Carolina defendants that are alleged to have known or should have known that the crematory defendants were engaging in misconduct, was outrageous and reprehensible. Defendants concede as much. ▮▮▮ They seek to limit liability to the statutory right holders or those who contract for funeral-related services on the basis that the policy of the state recognizes only the rights of those persons.

We disagree. Provision by statute for the disposal of human remains, and the imposition of duties and recognition of priority of right (§§ 7100, 7151), does not reflect a legislative intent or policy to protect only the section 7100 right holder or contracting party from the emotional trauma that may result from mistreatment or desecration of human remains. The statutory scheme

establishes only an orderly process by which to ensure that proper disposition is made of human remains.[24]

Other statutes reflect a policy of respecting the religious, ethical, and emotional concerns of close relatives and others having an interest in assuring that the disposition of human remains is accomplished in a dignified and respectful manner. Of particular significance is section 7054.7 which prohibits, absent consent by the statutory right holder, both multiple cremations and the commingling of cremated remains. Provision for consent demonstrates that the state has no interest itself in preventing multiple cremations or commingling of cremated remains. The prohibition evidently exists out of respect for the sensibilities of the surviving relatives.

Section 7152 limits anatomical gifts if it is known that the decedent "was a member of a religion, church, sect, or denomination which relies solely upon prayer for the healing of disease or which has religious tenets that would be violated by the disposition of the human body or parts thereof . . . ." Again, a policy of respecting religious beliefs with regard to the disposition of human remains is manifest.

Similar recognition that the sensibilities of all survivors merit protection is found in other legislation. Section 7050.5 prohibits desecration of human buried remains, and makes special provision for proper disposition of Native American remains discovered during an excavation. The Legislature's findings include express recognition of Native American "concerns regarding the need for sensitive treatment and disposition" of such remains. (Stats. 1982, ch. 1492, § 1, subd. (2) p. 5778. Cf. *Bock* v. *County of Los Angeles* (1983) 150 Cal.App.3d 65 [197 Cal.Rptr. 470] [statutes governing coroner's records not designed to protect against risk of emotional distress to relative of decedent who was not promptly identified].)

Section 8115 permits cities and counties to establish standards governing interment in order to ensure, inter alia, "decent and respectful treatment of human remains," and section 8101 prohibits interference with persons engaged in funeral services or interments.

---

[24]The statutory duty to bury the dead, and right to control the disposition of remains, evolved from a common law obligation imposed to ensure the right of every person to "a decent Christian burial." The right to compel the next of kin to dispose of the body is now an exercise of the police power having its basis in both public health and sanitation, and the interest of the state to avoid the expense and involvement in supervision of burying abandoned dead. (Comment, *Property—Nature of Rights in Dead Bodies—Right of Burial* (1939) 12 So.Cal.L.Rev. 435, 438.)

This history does not support the assumption inherent in the opinion of Justice Kennard that the Legislature had in mind the likelihood of emotional distress when it designated the order of priority.

Defendants' conduct transgressed this clearly expressed state policy giving recognition to, and imposing on providers of funeral-related services a duty to respect, the expectations of both decedents and their survivors that the remains will be accorded dignified and appropriate treatment.

Imposition of civil liability for misconduct of the type alleged is consistent with the degree of moral blame attached to that conduct, and with the goal of deterring future harm of a similar nature.

### 3. Burden and consequences to the community.

Defendants contend that holding them liable to the plaintiffs who seek damages in this case would impose an intolerable burden which would, in turn, result in detriment to the public by decreasing the availability of and/or increasing the cost of funeral-related services.

We disagree. Limiting the plaintiffs to those close relatives who were aware that the services were being performed and for whom the services were performed significantly reduces defendants' potential liability for negligently inflicted emotional distress. The egregious and intentional nature of the conduct at issue suggests that imposing liability does not threaten defendants with future or continuing liability for conduct over which they have no control. Liability for negligently inflicted emotional distress exists only for those acts that would foreseeably cause serious emotional distress to foreseeable victims to whom a duty is owed. While the intentional nature of the conduct involved suggests that insurance may not be available as a means by which to defray the expense, the cost to defendants of avoiding or preventing similar misconduct in the future is minimal.[25]

No policy suggests that defendants should be shielded from the consequences of their conduct by refusing to recognize the right of these plaintiffs to recover for the severe emotional distress they have suffered as a direct result of defendants' misconduct.

---

[25]It is true, as defendants claim, that society has created other methods by which to regulate the conduct of persons who provide funeral-related services. Administrative sanctions may be imposed by the licensing agencies, the Board of Funeral Directors and Embalmers and the Cemetery Board, and criminal penalties may be imposed. (Bus. & Prof. Code, §§ 7606, 7686, 9725-9737, 9748, 9749.5, 9789.)

The duration and extent of misconduct alleged by plaintiffs suggest that the availability of alternative means by which to deter misconduct of the type alleged here has not been and is unlikely to be an adequate deterrent. Additionally, there is no suggestion of legislative intent to limit or extinguish civil liability for such conduct. The Legislature has, on the other hand, established such limits where deemed appropriate. (See, e.g., § 7155.5.) In so doing, the Legislature has expressly recognized and implicitly approved civil liability.

### 4. *Disproportionate culpability.*

Defendants argue that if the reasoning and rule of *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 667-668, and *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 165, footnote 6 [216 Cal.Rptr. 661, 703 P.2d 1], limiting recovery for negligent infliction of emotional distress to those who contemporaneously observe both the negligent act and the injury it causes is not applied to the claims of these plaintiffs, then they will suffer liability that is out of all proportion to their culpability.[26]

Those cases did distinguish a plaintiff whose emotional distress was engendered by witnessing serious injury to a close relative from one who suffered emotional distress on learning of the injury from another person. The defendants in those cases had no preexisting duty to the plaintiff, however. Plaintiffs here do not seek relief on the basis of witnessing the injury of another, but for an injury caused by the breach of a duty owed directly to each plaintiff.

The *Thing* v. *La Chusa* limitation on *Dillon* v. *Legg* (*supra,* 68 Cal.2d 728) recovery is not appropriate for that reason. Moreover, because misconduct of the type alleged here—mistreatment of human remains by a crematory—while likely to cause severe emotional distress, would rarely, if ever, take place within the immediate presence and view of the foreseeable victims, providers of funeral-related services would avoid liability for injuries caused by their outrageous conduct if a similar limitation were applied. No public policy supports the immunity defendants seek.

Defendants' attempt to analogize the emotional distress injuries alleged here to that in issue in *Thing* v. *La Chusa, supra,* and *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, also fails for other reasons. In *Thing* v. *La Chusa, supra,* we restricted recovery to close relatives who are percipient witnesses to the negligent injury of the tortfeasor's immediate victim in order to avoid unlimited liability out of all proportion to the culpability of the negligent actor, and in recognition that the percipient witness usually suffers an emotional impact beyond that suffered whenever one learns from another of the death or injury of a loved one. (*Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 667.) Here, by contrast, the emotional injury is suffered by persons for whom the defendants have undertaken to provide a service, the very purpose of which is to alleviate existing and avoid future emotional distress arising from the death. The concerns which justified the restrictions that defendants' urge us to extend to this case are not present. The potential

---

[26]Because the crematory conduct here was intentional and can easily be avoided by all of the classes of defendants, we do not share the view that funeral-related costs will likely rise if these plaintiffs are permitted to recover.

plaintiffs are limited to those for whom defendants performed a service. The defendants' potential liability is not out of proportion to their conduct, and it is not based simply on the type of emotional distress the plaintiffs could be anticipated to suffer as a result of the death of a loved one.

Thus, permitting these victims to recover for the emotional distress they suffer does not threaten, as was the case in *Thing* v. *La Chusa*, unlimited liability for conduct that is simply negligent. Intentional and outrageous conduct on the part of the crematory defendants, of which the mortuary and Carolina defendants knew or should have known, is alleged. The class of potential plaintiffs we approve here is limited in number since it encompasses only those close relatives who were aware both of the death of a loved one and the nature of the funeral-related services that were to be performed on their behalf. Defendants will not be liable, as they fear, to persons not yet born when the misconduct occurred, or who had no knowledge that their relative had died until they learned of the mistreatment of the remains. They will not be liable to other family members who are upset by the type of services for which the contracting party arranged. Nor is the number of potential plaintiffs significant. Defendants' purported liability to the relatives of more than 16,000 decedents is not a factor arising from a failure to narrow the class of potential plaintiffs. Rather, it is a factor of the number of decedents whose remains defendants allegedly mistreated.

C. *Causation: Connection Between Conduct of Mortuary and Crematory Defendants and Injury.*

Our conclusion that plaintiffs have standing as direct victims of defendants' misconduct does not resolve that part of defendants' claim that plaintiffs lack standing, in which they observe that plaintiffs allege only emotional distress caused by media reports of defendants' misconduct. We consider this aspect of defendants' argument as one asserting that the complaint fails to state a cause of action because it does not allege facts sufficient to establish that plaintiffs' injury was caused by the breach of the duty owed to plaintiffs.

A plaintiff seeking to recover damages from a negligent defendant must allege a causal connection between the negligence and the plaintiff's injury. (*Dunn* v. *Dufficy* (1924) 194 Cal. 383, 386 [228 P. 1029].) A plaintiff "must allege a causal connection between the negligence . . . and the injury he suffered. Ordinarily that is accomplished by implication from the juxtaposition of the allegations of wrongful conduct and harm. (See 4 Witkin, Cal. Procedure [(3d ed. 1985)] Pleading, §§ 561-566, pp. 600-606.) However, where the pleaded facts of negligence and injury do not naturally give rise to an inference of causation the plaintiff must plead specific facts

affording an inference the one caused the others." (*Blain* v. *Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1066 [272 Cal.Rptr. 250].)

Although introduced into these proceedings by the trial court as a "standing" question, the trial court did so on a theory that plaintiffs' standing to recover from defendants for the emotional injuries they have suffered turns on whether all of the individual plaintiffs and the class members have alleged or may be able to state a cause of action against defendants. To do so they must allege facts to establish that causal connection. As did the Court of Appeal, therefore, we consider the issue as if it had been raised by a demurrer to the complaint.

■ We agree with the defendants that media or other secondhand reports about psychologically devastating events are not a sufficient basis for imposition of liability for emotional distress suffered by persons who are upset thereby. Damages may be recovered only for an injury resulting from defendant's breach of a duty owed to the plaintiff. The duty here was to provide respectful and dignified treatment of the remains of the plaintiffs' particular decedents. Media reports of a general pattern of misconduct are not sufficient, in and of themselves, to establish that defendants' misconduct included mishandling of the remains of each plaintiff's decedent. Thus, an allegation that a plaintiff suffered emotional distress on learning of that pattern of misconduct does not allege injury caused by a breach of a duty owed to the plaintiffs.

Plaintiffs allege, however, that they learned from the media reports that the remains of "their" decedents had been improperly treated. The ability of each plaintiff to prove either that at the time the plaintiff learned of the misconduct he or she knew or had substantial reason to believe that the decedent was a victim of defendants' misconduct,[27] or that the alleged continuing emotional distress each plaintiff suffers is based on knowledge that the decedent's remains have been mishandled, is a question that is not relevant at this stage of the proceedings. The question is only whether the complaint alleges a sufficiently direct causation between defendants' conduct and the emotional distress suffered by plaintiffs. We conclude that it does.

We are not persuaded by defendants' argument that permitting recovery in this case will create tort liability for the emotional impact of reports of

---

[27]Counsel for plaintiffs asserted at oral argument that during discovery plaintiffs have obtained evidence that will enable them to identify many of the decedents whose remains were mishandled and that many plaintiffs suffer emotional distress because they will never know whether their decedent's remains were among those mishandled. Neither of these bases for emotional distress is alleged in the complaint. Whether to permit further amendment to allege emotional distress based on the newly discovered evidence, or the inability to ascertain the treatment given to a plaintiff's decedent, is a matter within the discretion of the trial court.

disturbing events carried on the evening news, and for conduct which occurred many years in the past. If plaintiffs are unable to establish a direct causal connection between defendants' misconduct and the emotional distress suffered by plaintiffs, then they may not recover. A plaintiff who is unable to establish that he or she suffered severe emotional distress, and that the emotional distress was caused by a well-founded substantial certainty that his or her decedent's remains were among those reportedly mistreated, may not recover damages. A generalized concern that the remains of a relative may have been involved, arising out of a media report of a pattern of misconduct, is insufficient to satisfy the requirement that there be a direct connection between a defendant's conduct and the injury suffered by the plaintiff. It does not supply a necessary element—that the injury, here emotional distress, be caused by a breach of the defendant's duty to the particular plaintiff. (See *Khan* v. *Shiley* (1990) 217 Cal.App.3d 848 [266 Cal.Rptr. 106]; *Stahl* v. *William Necker, Inc.* (1918) 184 A.D. 85, 92 [171 N.Y.S. 728, 733].) On the other hand, were we to accept the suggestions of Justice Kennard that these plaintiffs be permitted to recover unless defendants prove that their decedents' remains were not among those mistreated, a plaintiff could recover damages for emotional distress based on nothing more than a media report of misconduct that may have involved the plaintiff's loved one.

The source of a plaintiff's knowledge of misconduct which cannot be readily observed, and the time at which the knowledge was acquired, do not otherwise affect the plaintiff's standing to seek relief except insofar as the statute of limitations may bar the action. These factors instead go to the reasonableness of a plaintiff's claim to have suffered severe emotional distress and thus present issues for the trier of fact. We cannot say as a matter of law, as defendants would have us do, that belated discovery of mistreatment of the remains of a close relative cannot cause severe emotional distress. That suits may be filed by some persons as to whom the degree of suffering claimed is unreasonable is not a basis for denying relief to all. (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 736-739.)

V

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 There is merit in defendants' claim that the Court of Appeal erred in concluding that because the mishandling of the remains of plaintiffs' decedents was intentional and outrageous, all family members and close friends of the decedents could recover damages for emotional distress. The Court of Appeal reached that conclusion upon reasoning that defendants'

conduct established the elements of the tort of intentional infliction of emotional distress.

The complaint does not allege, however, that any plaintiff was present when the misconduct occurred, or that defendants or any of them acted with the intent of causing emotional distress to the plaintiffs or knowledge that the conduct was substantially certain to cause distress to any particular plaintiff. The essence of the allegations is simply that the conduct was intentional, was outrageous, and was substantially certain to cause extreme emotional distress to relatives and close friends of the deceased.

■ The elements of the tort of intentional infliction of emotional distress are: " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . .' Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Davidson* v. *City of Westminister* (1982) 32 Cal.3d 197, 209 [185 Cal.Rptr. 252, 649 P.2d 894].) The defendant must have engaged in "conduct intended to inflict injury or engaged in with the realization that injury will result." (*Id.* at p. 210.)

It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware.

Past decisions of this court have invariably presupposed that the defendant's misconduct was directed to and was intended to cause severe or extreme emotional distress to a particular individual or, when reckless disregard was the theory of recovery, that the defendant directed the conduct at, and in conscious disregard of the threat to, a particular individual. In the seminal case permitting recovery even absent physical manifestation of the injury, *State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 337 [240 P.2d 282], we observed that theretofore California had allowed recovery when "physical injury resulted from intentionally subjecting the plaintiff to serious mental distress." There, of course, agents of the defendant had intentionally caused the plaintiff to suffer extreme fright for the purpose of gaining a business advantage of the particular plaintiff.

Similarly, in *Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579 [156 Cal.Rptr. 198, 595 P.2d 975], in which reckless disregard was a theory, the misconduct was the arrest of the plaintiff with knowledge that he had not committed an offense or disregard of whether he had. In *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58], and *Alcorn* v. *Anbro*

*Engineering, Inc.* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216], racial epithets were directed at the plaintiff. In *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278 [253 Cal.Rptr. 97, 763 P.2d 948], in which a wrongful death action was predicated on a theory of intentional infliction of emotional distress, defendant's conduct was directed specifically at the plaintiff's decedent during his lifetime. In *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743], defendants continually harassed the plaintiff.

*Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197, is particularly instructive. There the plaintiff sought damages for intentional infliction of emotional distress based on the conduct of police officers who failed to intervene or protect her when they observed an assault suspect enter the public laundromat; the suspect had stabbed the plaintiff while the defendants had the premises under surveillance. We held that in the absence of an intent on the part of the defendant officers to injure the plaintiff, their conduct was not the kind of extreme and outrageous conduct that would give rise to liability for intentional infliction of emotional distress. (*Id.* at p. 210.)

The requirement that the defendant's conduct be directed primarily at the plaintiff is a factor which distinguishes intentional infliction of emotional distress from the negligent infliction of such injury. We explained this distinction in *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159. There, the plaintiffs sought damages for the emotional distress they endured when over the course of several days they observed the deteriorating condition of their teenage son and the refusal of defendants to provide or permit them to provide needed medical treatment. Theories of negligent and intentional infliction of emotional distress were among the causes of action pled. This court held that while the complaint stated a cause of action for negligence, the elements of a cause of action for intentional infliction of emotional distress were not stated because the defendant's acts were directed at the child, not the parents.

"Plaintiffs appear to assume that a cause of action for intentional infliction of emotional distress may be established on the same theory as that for negligent infliction of emotional distress. The two torts are entirely different. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 233 et seq. and § 548 et seq.) . . .

"A cause of action for intentional infliction of emotional distress must allege facts showing outrageous conduct which is intentional or reckless and which is outside the bounds of decency. It has been said in summarizing the cases discussing intentional infliction of emotional distress that 'the rule which seems to have emerged is that there is liability for conduct exceeding

all bounds usually tolerated by decent society, of a nature which is *especially calculated to cause*, and does cause, mental distress of a very serious kind.' [Citations.] Here, although defendants' conduct did cause the plaintiffs untold distress, it is evident that the defendants acted negligently rather than with the purpose of causing the plaintiffs emotional distress." (*Ochoa* v. *Superior Court, supra*, 39 Cal.3d at p. 165, fn. 5.)

In *Ochoa*, the defendants' conduct was directed primarily at plaintiffs' decedent. (39 Cal.3d at pp. 172-173.) In concluding that recovery was not available under an intentional infliction of emotional distress theory, we noted that to the extent such recovery had been allowed, it has been limited to " 'the most extreme cases of violent attack, where there is some especial likelihood of fright or shock.' " (*Id.* at p. 165, fn. 5. Accord, *Coon* v. *Joseph* (1987) 192 Cal.App.3d 1269 [237 Cal.Rptr. 873].)

Recovery on an intentional infliction of emotional distress theory and based on reckless conduct has been allowed in the funeral-related services context. (See 2 Harper et al., The Law of Torts, *supra*, § 9.4 at pp. 621-624, and cases cited.) However, as Professors Prosser and Keeton note, the cases which describe the tort as intentional mishandling of a corpse actually seek to protect the personal feelings of the survivors. Therefore the tort is properly categorized as intentional infliction of emotional distress, and presupposes action directed at the plaintiff or undertaken with knowledge of the likelihood that the plaintiff will suffer emotional distress. (Prosser & Keeton, Torts, *supra*, at pp. 60-63.) These authors acknowledge the problems associated with permitting recovery for action that is not directed at the plaintiff or undertaken with knowledge of the likelihood of harm to the plaintiff, noting the doctrine of transferred intent is inappropriate in this context. They suggest that to justify recovery the action must be directed to the plaintiff, and if reckless conduct is the basis for recovery, the plaintiff is usually present at the time of the conduct and is known by the defendant to be present. (See also, Prosser, *Insult and Outrage* (1956) 44 Cal.L.Rev. 40, 56-59.)

We agree. "The law limits claims of intentional infliction of emotional distress to egregious conduct *toward plaintiff* proximately caused by defendant." (*Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1489 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027]. Italics added, original italics omitted.) The only exception to this rule is that recognized when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probabilitythat his or her conduct will cause severe emotional distress to that plaintiff.[28] (*Ledger* v. *Tippitt* (1985) 164 Cal.App.3d 625, 640-642 [210 Cal.Rptr.

---

[28]To the extent that it holds otherwise, *Delia S.* v. *Torres* (1982) 134 Cal.App.3d 471, 483-484 [184 Cal.Rptr. 787], is disapproved.

814]; *Taylor* v. *Vallelunga* (1959) 171 Cal.App.2d 107, 109 [339 P.2d 910].) Where reckless disregard of the plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the outrageous conduct occurs is recognized as the element establishing a higher degree of culpability which, in turn, justifies recovery of greater damages by a broader group of plaintiffs than allowed on a negligent infliction of emotional distress theory. (See Rest.2d Torts, § 868, com. g.)

 Plaintiffs here have not alleged that the conduct of any of the defendants was directed primarily at them, was calculated to cause them severe emotional distress, or was done with knowledge of their presence and of a substantial certainty that they would suffer severe emotional injury. We conclude, therefore, that the model complaint does not establish that any of the plaintiffs has standing to sue for intentional infliction of emotional distress. Because this is a coordination proceeding, however, whether to permit further amendment should be left to the discretion of the trial court.

## VI

### DEVOLUTION

The Court of Appeal held that, on the death of a statutory right holder, the section 7100 power to control the disposition of remains devolves pursuant to the priorities established by that section. Defendants Laurieanne Lamb Sconce, Jerry Sconce, and the Lamb Funeral Home suggest that this holding is ambiguous and if read to permit a succession of persons to sue for their individual emotional distress would create a never ending chain of plaintiffs. The holding that the right devolves is consistent with the legislative intent that there be a person having both the obligation and the right to dispose of human remains. Our conclusion that relatives other than the statutory right holder have standing to sue, but that only those persons who were aware of the funeral-related services to be performed at the time the services were performed have standing, eliminates any potential ambiguity.

## VII

### DISPOSITION

The judgment of the Court of Appeal is modified to direct the superior court to conform its order on standing to sue to reflect the views expressed herein.

Lucas, C. J., Panelli, J., George, J., and Turner (Paul A.), J.,* concurred.

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

**MOSK, J.,** Concurring and Dissenting.—I agree with the majority that those close family members who were aware of both the decedent's death and the nature of the funeral services to be performed may state a claim for negligent infliction of emotional distress.[1] I also agree that the power to control the disposition of remains devolves according to the priorities established by section 7100 of the Health and Safety Code.

I do not agree, however, that no plaintiffs may sue for intentional infliction of emotional distress (IIED) because the admittedly outrageous conduct was not directed primarily at them, nor did they witness it. It is paradoxical that the majority find defendants liable for negligent but not intentional conduct. The latter, being more reprehensible, should render the perpetrators liable to a greater rather than a lesser extent.

The majority assert that to require defendants to perform the acts in plaintiffs' presence ensures the high degree of culpability necessary to justify the greater damages allowed in an IIED case. In my view, if the acts alleged are found to be true, defendants are highly culpable regardless of whether plaintiffs witnessed the mutilation. I would allow the trier of fact to consider the issue of IIED.

Further, I would not limit the class of plaintiffs in IIED cases to blood relations. The issue of whether a person suffered severe distress is properly left to the trier of fact. We should not rule that, as a matter of law, a decedent's estranged sibling may have suffered emotional distress but not a decedent's close and longtime business partner.

I would allow plaintiffs to proceed on the IIED theory because defendants' alleged conduct was reckless. IIED may be shown in three ways: a subjective intention to cause emotional distress, a substantial certainty that such distress would result, or reckless behavior leading to emotional distress. The majority (maj. opn., *ante*, at p. 906) deny plaintiffs a cause of action for IIED because they did not allege that defendants' conduct "was directed primarily at them, was calculated to cause them severe emotional distress, or was done with knowledge of their presence and of a substantial certainty that they would suffer severe emotional injury."

Although defendants may have been motivated by profit rather than by a subjective desire to distress these plaintiffs, the trier of fact could still hold defendants liable on a reckless conduct theory. Recklessness may be found

---

[1] Of course, exceptions to this general rule may arise. A close family member who is out of the country at the time of the decedent's death or who is in the hospital and not strong enough to hear the news may, in my view, be included in the plaintiff class.

from acts "of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 34, p. 213.) IIED may be distinguished from negligent infliction of emotional distress (NIED) because recklessness requires a higher degree of fault than simple negligence.

The majority acknowledge (maj. opn., *ante*, at p. 905) that IIED may be shown from conduct undertaken with knowledge of the likelihood that the plaintiff will suffer emotional distress. If defendants in this emotionally charged occupation intentionally mutilated bodies and comingled remains, they necessarily realized that their conduct would cause the decedents' loved ones severe emotional distress. (See *Golston* v. *Lincoln Cemetery, Inc.* (Mo.Ct.App. 1978) 573 S.W.2d 700, 704.)

The limits that the majority seek to place on the tort of IIED are, in this context, unjustified. To require that plaintiffs be present at the scene of the outrageous conduct is unrealistic. It will be a rare case indeed in which a funeral home mutilates a decedent's body in the presence of the grieving family or displays the mutilated body to them. The majority thus effectively limit a plaintiff's recourse in cases involving this type of reprehensible conduct to the lesser tort of NIED. Further, the majority's requirement that defendants consciously direct outrageous conduct at plaintiffs makes the "recklessness" prong indistinguishable from the "subjective intent" prong.

Other states' courts have found a cause of action for IIED under similar circumstances. For example, in *Whitehair* v. *Highland Memory Gardens, Inc.* (W.Va. 1985) 327 S.E.2d 438, 440 [53 A.L.R.4th 383], the court held that the plaintiff could state a cause of action when the defendant mishandled the bodies of her sister, two aunts and a cousin during relocation of its cemetery. In *Scarpaci* v. *Milwaukee County* (1980) 96 Wis.2d 663 [292 N.W.2d 816, 820, 18 A.L.R.4th 829], the court held that parents who alleged that the county wrongfully performed an autopsy on their son could state a claim for intentional interference with the right to bury their child. And in *Carney* v. *Knollwood Cemetery Ass'n* (1986) 33 Ohio App.3d 31 [514 N.E.2d 430, 435], the court held that the plaintiffs, who learned by a television broadcast that the grave of their ancestor had been disturbed, could state a claim for IIED.

A Florida appellate court recently explained that in cases in which the defendant's outrageous conduct is directed to a third person, the emotional distress felt by the victim's close relatives on learning of the acts is not actionable unless they observed the conduct and the conduct was directed at them; however, "unique considerations" apply in cases involving dead bodies or pictures of dead bodies. (*Williams* v. *City of Minneola* (Fla. Dist.

Ct. App. 1991) 575 So.2d 683, 694.) The court held that the mother and sister of a decedent could state a cause of action for outrageous infliction of emotional distress by reckless conduct based on the defendants' exhibition of a videotape of the decedent's autopsy, even though they were not present at the display. It reasoned, "One who behaves outrageously with regard to pictures of a dead body can be presumed to know that severe emotional distress will be inflicted thereby on those who were closely related to the deceased, should those survivors become aware of the tort-feasor's behavior." (*Id.* at p. 693.)

The cases cited by the majority do not apply to the present situation. *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1], held that the plaintiffs, parents of a minor who died while confined in a juvenile facility, could not state a claim for IIED based on the defendants' failure to provide or permit them to provide needed medical treatment for their teenage son; we reasoned that the defendants' acts were directed at the child, not the parents. One obvious fact, however, readily distinguishes the case: in *Ochoa* the defendants' outrageous conduct was directed at a living person; by contrast, the only persons who could be hurt by defendants' outrageous conduct in the present case are the decedents' survivors.

As the majority note, public policy considerations limit the right of a bystander to recover damages for the emotional distress suffered as a result of witnessing *negligent* conduct that causes physical injury to a third person: "If any and all bystanders who witnessed the injury-causing event were permitted to recover for ensuing emotional distress, the defendant's liability could be out of all proportion to the degree of fault." (Maj. opn., *ante*, at p. 885.)

The scope of liability for *intentional* infliction of emotional distress is not, however, limited by the same public policy dictates. As the Court of Appeal stated in this case, "an intentional wrongdoer is liable for a broad range of the effects of intentional acts. . . . Avoidance of liability out of all proportion to a defendant's negligence is not a concern when an intentional tort is alleged. As a society, we seek to punish the intentional wrongdoer and deter such conduct by others."

Further, I can find no public policy reason to limit the class of potential plaintiffs who may sue for IIED to family members. A longtime business associate should be allowed to present a case for IIED after a preliminary showing that he or she had a close relationship with the decedent. Proximate causation principles such as foreseeability do not belong in the analysis of an intentional tort. Of course, each plaintiff will have to prove all the elements

of his or her case. I would merely hold that they should be permitted to so attempt.

**KENNARD, J., Concurring and Dissenting.**—I agree with the majority that the complaint at issue does not state a cause of action for intentional infliction of emotional distress. I agree also that persons who have a right to control the disposition of a decedent's remains, and who seek to recover damages for emotional distress caused by the negligent or intentional mishandling of the remains, need not allege or prove that they witnessed the mishandling.

I do not agree, however, that the class of persons who may recover damages for emotional distress negligently caused by the mishandling of remains includes all of the decedent's close family members who were aware that funeral or crematory services were being performed. That holding disregards the decisions of this court imposing limits on tort actions for intangible injuries. Those decisions compel the conclusion that the class of plaintiffs who may recover emotional distress damages for negligent or intentional mishandling of remains is limited to persons having a right to control the disposition of the remains and those members of the decedent's immediate family who learned of the mishandling by observing it or its direct consequences.

I also disagree with this statement: "A plaintiff who is unable to establish . . . that the emotional distress was caused by a well-founded substantial certainty that his or her decedent's remains were among those reportedly mistreated, may not recover damages." (Maj. opn., *ante*, p. 902.) Under the particular facts of this case, imposing such a burden could unjustly prevent recovery by many plaintiffs. I would hold that a plaintiff may recover damages for emotional distress caused by knowledge that his or her decedent's remains were entrusted to defendants for cremation during a period of time when the defendants frequently mishandled remains so entrusted to them, unless the defendants can prove that the remains of the plaintiff's decedent were not mishandled.

I

When a mortuary or crematory negligently or intentionally mishandles a decedent's remains, those persons having a right to control the disposition of the remains may sue in tort and recover damages for mental distress caused by the mishandling. This right of recovery is recognized in California and virtually every other state. (*Allen* v. *Jones* (1980) 104 Cal.App.3d 207, 215 [163 Cal.Rptr. 445]; Rest.2d Torts, § 868; Annot., Civil Liability of Undertaker in Connection With Transportation, Burial, or Safeguarding of Body

(1987) 53 A.L.R.4th 360.) The right's existence is not at issue here. The main points in dispute are, first, whether a plaintiff must learn of the mishandling by observing it or its immediate consequences in order to recover, and, second, whether close family members or friends who have *no legal right* to control disposition of a decedent's remains may also recover mental distress damages. As I shall explain, these points are related.

When a plaintiff whose only injury is emotional distress brings a tort action, courts impose restrictions not imposed in tort actions brought to recover damages for physical or financial harm. At one time, courts justified these restrictions by the need to prevent assertion of fraudulent claims. (See *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 735-739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].) More recently, this court has given a different explanation. Because a single negligent act may cause emotional distress to any number of people, unrestricted liability for emotional distress would be limitless and disproportionate to a negligent defendant's moral blame. Through increased insurance premiums and increased prices for goods and services, the general public would ultimately bear the enormous burden of paying the damages. Through taxes, the public would also pay the substantial cost of providing a system to resolve disputes and enforce awards. (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 661-667 [257 Cal.Rptr. 865, 771 P.2d 814].)

These considerations have led this court to carefully circumscribe liability for intangible injuries. Thus, although a spouse may recover damages for loss of consortium, a child, parent, or unmarried cohabitant may not. (See *Elden* v. *Sheldon* (1988) 46 Cal.3d 267 [250 Cal.Rptr. 254, 758 P.2d 582]; *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871]; *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858]; *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669].) And this court has held that a plaintiff may recover damages for emotional distress occasioned by negligent physical injury to a third person only if the plaintiff "(1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 667-668, fns. omitted.)

To decide whether to apply these or similar limits in an action seeking emotional distress damages for the negligent or intentional mishandling of decedents' remains, it is helpful to examine the statutory scheme governing the disposition of a decedent's remains.

Under the statutory scheme (Health & Saf. Code, § 7100), one or more family members of a decedent hold the right to control disposition of the decedent's remains. The holder or holders of the right, in person or through another, may contract for funeral-related services that are contrary to the wishes and expectations of other close family members. It sometimes happens that a decedent's spouse and parents, for example, will have differing views on whether the remains should be cremated or buried and, if buried, whether they should be embalmed and where they should be buried. (See, e.g., *Sinai Temple* v. *Kaplan* (1976) 54 Cal.App.3d 1103, 1113, fn. 15 [127 Cal.Rptr. 80].) Because the spouse has the statutory right, the spouse's directions must be followed. The spouse may even exclude the parents from the funeral services. The parents have no right to be compensated for any distress they experience as a result of disposition of their child's remains in accordance with the spouse's directions.[1] If, on the other hand, the parents procure a disposition of the remains against the spouse's wishes, the spouse may sue the parents and the mortuary for tortious interference with the spouse's right to control disposition of the remains. (*Id.* at p. 1112.)

When a mortuary or crematory undertakes to provide funeral-related services, it assumes a duty to the person or persons holding the statutory right of control and to anyone who contracts for the services on behalf of the holder of the statutory right. Although it is generally foreseeable that a breach of this duty will cause emotional distress to other family members (and also to the decedent's close personal friends), this court has warned that foreseeability of injury is not an adequate criterion by which to define a duty to avoid inflicting intangible injuries. For example, although it is foreseeable that a doctor's negligent treatment of a patient will cause emotional distress to the patient's family, this court has declined to recognize that a doctor who undertakes to treat a patient thereby assumes a duty to avoid emotional harm to the patient's family. (See *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 589-590 [257 Cal.Rptr. 98, 770 P.2d 278].) Here too, we should distinguish between those for whom a mortuary or crematory undertakes to provide funeral-related services, and who therefore would be entitled to enforce the agreement, and others who may be affected by the manner in which those services are performed, but who would not be entitled to enforce the agreement.

---

[1]The holders of the statutory right could have validly consented to all of the defendants' alleged acts in this case, including harvesting organs, removing precious metals, multiple cremation, and commingling of ashes. Defendants' alleged conduct in this case is tortious only because it was done without that consent. Had defendants obtained the consent of the holders of the statutory rights, other family members would have possessed no right of action for emotional distress damages, no matter how deeply they might have been offended.

Because a mortuary's mishandling of remains violates the express or implied plan of disposition, those who hold the right to establish and enforce the plan of disposition are the direct victims of the mortuary's wrongful acts. Other family members and friends are, at best, third party or "bystander" victims.

I consider first the direct victims of a mortuary or crematory's negligent or intentional mishandling of remains. When a plaintiff possessing a legal right to control the disposition of a decedent's remains sues a mortuary or crematory for negligent or intentional interference with that right, the policy concerns discussed above do not support imposition of a requirement that the plaintiff have been present to observe either the wrongful act or its consequences.

First, the danger of fraudulent claims is minimal. Under the statutory scheme (Health & Saf. Code, § 7100), the right to control disposition of a decedent's remains belongs to the decedent's spouse or nearest surviving relation. The mishandling of a corpse is so likely to result in substantial mental distress to a decedent's spouse or close relations that the situation provides its own guarantee that the claim is genuine. Whatever additional assurance of genuineness a "presence" requirement would provide is not needed.

Second, the class of persons having a legal right to control disposition of a decedent's remains is defined and limited by statute and contract. Therefore, a negligent defendant's liability will not be indefinitely multiplied, out of all proportion to fault. Because the plaintiff class is limited, the resulting societal costs—in the form of increased insurance premiums for purveyors of funeral and cremation services, increased prices for those services, and increased costs to the court system and taxpayers—will not be unreasonably or unacceptably high.

Finally, imposing a "presence" requirement would be tantamount to granting an immunity from civil liability for many forms of mishandling that by their nature occur out of the view of the bereaved relatives. Civil liability not only compensates injuries, it also serves society as a whole by encouraging high standards of care to avoid injuries. Society has a compelling interest in assuring that those who are entrusted with the bodies of our dead exercise the greatest of care. (See *Quesada* v. *Oak Hill Improvement Co.* (1989) 213 Cal.App.3d 596, 610 [261 Cal.Rptr. 769].) Because it furthers this societal interest, an award of tort damages "is a useful and necessary means to maintain the standards of the profession . . . ." (*Allen* v. *Jones, supra,* 104 Cal.App.3d 207, 214.) Because the person or persons having the right to control disposition of the decedent's remains are in the best position to vindicate society's interests, their actions should not be restricted by imposing a "presence" requirement.

The balance of societal costs and benefits must be reassessed when the plaintiff seeking recovery is one who has no legal right to control the disposition of the decedent's remains. Allowing close relatives or friends to recover makes the litigation more complex, increasing the burden on the courts and ultimately the taxpayers. Each additional claimant multiplies the defendants' potential liability, thus leading ultimately to increased prices for all purchasers of funeral services. Finally, allowing all close relatives to sue is not necessary for deterrence: fear of suits by the statutory right holders and contracting parties provides a sufficient incentive to ensure due care by purveyors of mortuary and crematory services.

For these reasons, third party claims for negligent or intentional mishandling of a decedent's remains should be carefully circumscribed. They should not be barred entirely, however. As the comment to section 868 of the Restatement Second of Torts observes, it would be incongruous to bar recovery by a close family member of the decedent, such as a daughter, who witnessed a mishandling of the remains, while permitting recovery by another family member, such as the decedent's widow, who did not observe the mishandling but who possessed the exclusive right to control disposition of the body. (See also *Quesada* v. *Oak Hill Improvement Co., supra,* 213 Cal.App.3d 596.)

Adapting the requirements this court has imposed on third party claims in an analogous situation, I would hold that a plaintiff who has no right to control a decedent's remains may recover for emotional distress occasioned by the negligent or intentional mishandling of the remains only if the plaintiff (1) is a close family member of the decedent (as defined by the Court of Appeal and the majority); (2) learns of the mishandling by observing it or its direct consequences (the wrong body in the casket, an empty container of cremated remains, and so forth); and (3) suffers serious emotional distress as a result.

The majority reaches a different conclusion. It treats all the decedent's close family members, not just the statutory right holders and contracting parties, as the direct victims of an alleged negligent or intentional mishandling of remains, and it recognizes no class of third party victims. The majority offers various reasons for its conclusions. None is persuasive.

The majority first argues that recovery should not be limited to statutory right holders and contracting parties because other family members may suffer greater emotional distress. This court has rejected similar arguments in other cases. Thus, we have limited recovery for loss of consortium to spouses, even though in a particular case a child, parent, or unmarried cohabitant may have suffered greater loss, and we have held that only close

family members may recover for emotional distress occasioned by negligent physical injury to a third person, even though others may suffer greater emotional distress.

The majority asserts that the order of priority set forth in Health and Safety Code section 7100 is "not a reliable indicator" of the likelihood of emotional distress. (Maj. opn., *ante*, p. 887.) This assertion constitutes an unfounded attack on the wisdom of the statutory scheme. Under section 7100, the right to control the disposition of a decedent's remains, "unless other directions have been given by the decedent," passes in the following order: the surviving spouse, the surviving child or children, the surviving parent or parents, "the person or persons in the next degrees of kindred" who would inherit from the decedent, and the public administrator. This order evidently reflects a legislative judgment as to the person or persons the decedent would most likely have chosen to control the disposition of the remains, and thus the person or persons to whom the decedent was most strongly and intimately related. Without doubt, the persons closest to the decedent will be the most severely distressed by a mishandling of the remains. Thus, the statutory scheme, although not intended to identify those persons most likely to be distressed by a mishandling of the remains, effectively performs that function. I would accept the statutory scheme as a rational method for determining the individual or individuals most closely related to the decedent and thus most likely to be affected by any mishandling of the decedent's remains.

The majority next asserts that a mortuary or crematory assumes a duty to all close family members, and not merely to those having a legal right to control disposition of the decedent's remains. To support this assertion, the majority looks to decisions of California courts and of the courts of other jurisdictions.

Decisions of other jurisdictions do not support the majority's holding. To the contrary, the courts of other states have recognized that a cause of action for emotional distress caused by the mishandling of human remains is premised on interference with a right to control the disposition of those remains. As one court remarked, quoting an earlier case, " 'The damages recoverable . . . are not for the injury done to the dead body, but are *for the wrong or trespass on the . . . right to the undisturbed possession and control of the body*, measured by the mental anguish and suffering of the plaintiff occasioned thereby . . . .' " (*Golston* v. *Lincoln Cemetery, Inc.* (Mo.Ct.App. 1978) 573 S.W.2d 700, 705, italics added.)[2] The following authorities are to

---

[2]In *Golston, supra,* the statutory right was held in common by the decedent's minor children. The court permitted the decedent's sister to sue, as well as the minor children, on the

the same effect: *Burns* v. *Anchorage Funeral Chapel* (Alaska 1972) 495 P.2d 70, 73 ("a claim for relief for wrongful interference with the right to preserve a dead body belongs exclusively to the surviving spouse or to the next of kin of the decedent"); *Allinger* v. *Kell* (1981) 102 Mich.App. 798 [302 N.W.2d 576, 579] ("Under tort law, recovery for the intentional or negligent mutilation of a dead body is based upon infringement of the right of the plaintiffs to have the body delivered for burial and interred without mutilation, other than that present at the time of death. [Citation.] Where a person has the right to bury a body, interference with that right is generally actionable."); *Sworski* v. *Simons* (1940) 208 Minn. 201 [293 N.W. 309, 311] (recognizing a cause of action for interference with the "legal right to the possession of the corpse for purposes of preservation and burial"); *Galvin* v. *McGilley Memorial Chapels* (Mo.Ct.App. 1987) 746 S.W.2d 588, 591 (recognizing a cause of action for breach of "the common law right of sepulchre—the right of the next of kin to perform a ceremonious and decent burial of the nearest relative"); *Strachan* v. *John F. Kennedy Memorial Hospital* (1988) 109 N.J. 523 [538 A.2d 346, 350] (recognizing a tort cause of action for emotional distress occasioned by infringement of " 'the right to bury the dead and preserve the remains' "); *Baumann* v. *White* (N.Y.Sup.Ct.Spec.Term 1962) 234 N.Y.S.2d 272, 273 (recognizing that a cause of action for an undertaker's negligent preparation of a body may be asserted by "the next of kin charged with its burial" and by those who engaged the undertaker); *Thompson* v. *Duncan Bros. Funeral Homes, Inc.* (1982) 116 Misc.2d 227 [455 N.Y.S.2d 324, 326] (same); *Cercelli* v. *Wein* (1969) 60 Misc.2d 345 [303 N.Y.S.2d 316, 317] (same); and *Scarpaci* v. *Milwaukee County* (1980) 96 Wis.2d 663 [292 N.W.2d 816, 820] ("The basis for recovery of damages is found not in a property right in a dead body but in the personal right of the family of the deceased to bury the body.").[3]

---

ground that she had made the funeral arrangements (that is, she was a contracting party) and that the cause of action she had pleaded was for intentional infliction of emotional distress rather than negligence. (573 S.W.2d 700, 709-710.) The sister was also a percipient witness of the immediate consequences of the defendant's misconduct: returning to the grave site three months after the burial, she found an open hole in which her sister's body lay partially exposed. (*Id.* at p. 703.)

[3]In this paragraph I have intentionally cited the same out-of-state cases the majority cites. (Maj. opn., *ante*, pp. 887-888, fn. 17.) I leave it to the reader to judge which of the competing positions those cases actually support. In each case, it appears that the parties permitted to recover were statutory right holders, contracting parties, or both.

I have omitted only *Papieves* v. *Lawrence* (1970) 437 Pa. 373 [263 A.2d 118, 48 A.L.R.3d 233] and *Carney* v. *Knollwood Cemetery Ass'n* (1986) 33 Ohio App.3d 31 [514 N.E.2d 430]. These cases do not discuss standing to assert claims for negligent mishandling of remains, but rather standing to assert claims for intentional or wanton misconduct. *Papieves* suggests, without deciding, that even in that context the plaintiff must be "the member of the decedent's family who is entitled to the disposition of the body." (263 A.2d 118, 120.) The plaintiffs in that case, as parents of the minor decedent, were clearly statutory right holders. *Carney* is the

California authorities are similarly unhelpful to the majority. The majority cites only two cases in support of the proposition that a mortuary's duty of care runs to all close family members of the decedent. *Draper Mortuary* v. *Superior Court* (1982) 135 Cal.App.3d 533 [185 Cal.Rptr. 396], was a lawsuit brought by a plaintiff who was both the contracting party and, as the decedent's husband, the statutory right holder. The court had no occasion to discuss standing by persons who were neither statutory right holders nor contracting parties. A decision is not authority for a proposition not considered in the court's opinion. (*People* v. *Myers* (1987) 43 Cal.3d 250, 265, fn. 5 [233 Cal.Rptr. 264, 729 P.2d 698]; see also *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 734-735 [257 Cal.Rptr. 708, 771 P.2d 406].) In *Quesada* v. *Oak Hill Improvement Co.*, *supra*, 213 Cal.App.3d 596, the family members witnessed the mishandling of the decedent's remains. They were therefore entitled to recover as "bystanders," as I have explained.

Finally, the majority seeks to justify its conclusion by weighing foreseeability, moral blame, the burden on the community, and disproportionate culpability. The analysis is inconsistent with this court's prior decisions.

Certainly it is foreseeable that the mishandling of a decedent's remains will cause emotional distress to the decedent's close family members (and close personal friends as well) who learn of the mishandling. Yet this court has denied standing in other cases where emotional distress is no less foreseeable. Parents who learn that their child has been permanently disabled in an automobile collision or as a result of a negligently performed surgical procedure have no standing to seek emotional distress damages from the person who negligently caused the injury. As this court has explained, "foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of the NIED [negligent infliction of emotional distress] action" (*Thing* v. *La Chusa, supra*, 48 Cal.3d 644, 663), and "[e]ven if it is 'foreseeable' that persons other than closely related percipient witnesses may suffer emotional distress, this fact does not justify the imposition of what threatens to become unlimited liability for emotional distress on a defendant whose conduct is simply negligent" (*id.* at p. 667).

In weighing the factor of moral blame, the proper focus is not on the egregious misconduct alleged in this particular case, but on the minimum

only case cited by the majority that permitted a party who was neither a statutory right holder nor a contracting party to recover for the mistreatment of remains. Indeed, the court granted standing to plaintiffs for the intentional mistreatment of the remains of their common ancestor who had died more than 20 years before 2 of the plaintiffs were born. (514 N.E.2d 430, 438 [conc. opn. of Nahra, J.].)

requirements for the cause of action under consideration. As the majority observes, "the tort with which we are concerned is negligence." (Maj. opn., *ante*, p. 884.) The decision in this case will become the "bright line" rule for all similar negligence actions involving the provision of mortuary and crematory services. I am unable to conclude that negligence is significantly more blameworthy in this than in other contexts, such as the driving of a motor vehicle or the performance of surgical procedures. For example, it is not obvious to me, although apparently it is to the majority, that commingling the ashes of the dead, at the risk of emotional distress to the decedents' survivors, is significantly more blameworthy than driving at high speed while intoxicated, at the risk of death to other highway users.

The majority's holding will impose a substantial burden on the community in the form of higher costs for mortuary and crematory services. As this court stated in a related context: "We cannot ignore the social burden of providing damages for loss of parental consortium merely because the money to pay such awards comes initially from the 'negligent' defendant or his [or her] insurer. Realistically the burden of payment of awards for loss of consortium must be borne by the public generally in increased insurance premiums or, otherwise, in the enhanced danger that accrues from the greater number of people who may choose to go without any insurance. We must also take into account the cost of administration of a system to determine and pay consortium awards; since virtually every serious injury to a parent would engender a claim for loss of consortium on behalf of each of his or her children, the expense of settling or litigating such claims would be sizable." (*Borer* v. *American Airlines, Inc., supra*, 19 Cal.3d 441, 447.)

In *Borer*, nine children asserted claims for loss of parental consortium. This court commented: "Even in the context of a consolidated action, the assertion of nine independent causes of action for the children in addition to the father's claim for loss of consortium and the mother's suit for ordinary tort damages, demonstrates the extent to which recognition of plaintiffs' asserted cause of action will multiply the tort liability of the defendant." (*Borer* v. *American Airlines, Inc., supra*, 19 Cal.3d 441, 449.) The majority's holding in this case, permitting all close family relatives (including parents, sisters, brothers, children, and grandchildren) to recover for emotional distress occasioned by learning of, without witnessing, the negligent mishandling of a decedent's remains, will multiply liability far beyond what the plaintiffs proposed (and this court rejected) in *Borer*. If, for example, a decedent had nine children (as in *Borer*) and each child in turn had nine children, the class of children and grandchildren would number ninety plaintiffs, each possessing an independent cause of action for a single negligent act.

This poses the problem of disproportionate culpability[4] that has caused this court to restrict standing in past cases: "The number of family members who might seek damages on the basis of a single incident could unreasonably enlarge the defendant's burden." (*Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 665.) The problem is no less significant here than in the "bystander" and loss-of-consortium contexts.

In my view, a weighing of the relevant policy considerations in light of this court's past decisions compels the conclusion that for the tort of negligence based on the mishandling of a decedent's remains the class of direct victims should be defined as those possessing a legal right to control disposition of the decedent's remains, and that outside this class of direct victims the right of recovery should be subject to limitations similar to those imposed by this court on recovery for emotional distress occasioned by negligent physical injury to a third person.

II

What the majority gives with one hand, it takes with the other. After opening the prospect of recovery to all close family members of the decedents, the majority shuts the door by restricting recovery to those plaintiffs who can show that their emotional distress was caused by "a well-founded substantial certainty" that their decedents' remains were "among those reportedly mistreated."[5] (Maj. opn., *ante,* p. 902.) The burden thus imposed by the majority may preclude all recovery for many plaintiffs who would otherwise qualify. Plaintiffs will be forced to rely on defendants' records to determine which bodies were mishandled. If those records are inadequate (and it seems unlikely the crematory defendants kept records detailing their misdeeds), many plaintiffs will never be able to determine whether the remains of their decedents were mistreated.

In this situation, I would apply the rule that when a plaintiff establishes tortious conduct by a defendant under circumstances making it virtually

---

[4]The majority's discussion of this factor is a classic example of circular reasoning. The majority first states it will consider various factors to determine whether a duty exists. When it reaches the factor of disproportionate culpability, it distinguishes the "bystander" cases on the ground that plaintiffs here seek relief "for an injury caused by the breach of a duty owed directly to each plaintiff." (Maj. opn., *ante,* p. 899.) But for those plaintiffs who are neither statutory right holders nor contracting parties, and to whom the defendants therefore owe no statutory or contractual duty, the only potential source of duty is tort law, and the existence of a duty in tort is the very point at issue.

[5]The majority's use of the word "reportedly" in this statement is puzzling. Surely the majority does not mean that a plaintiff would be entitled to recover from the mortuary and crematory defendants upon proof that the media had reported mistreatment of the plaintiff's decedent's remains, even though the defendants presented proof that the report was false.

impossible for the plaintiff to prove causation, the burden shifts to the defendant to establish a lack of causation. (See *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 772-775 [91 Cal.Rptr. 745, 478 P.2d 465].) Accordingly, I would hold that a plaintiff may recover damages for emotional distress caused by knowledge that the remains of his or her decedent were entrusted to the defendants for cremation during a period of time when the defendants frequently mishandled remains so entrusted to them, unless the defendants can prove that the remains of the plaintiff's decedent were not mishandled. This holding would not permit recovery "based on nothing more than a media report of misconduct." (Maj. opn., *ante*, p. 902.) Rather, it would require the plaintiff to prove that the defendants actually engaged in a pattern or practice of mistreating human remains during the time that the remains of the plaintiff's decedent were entrusted to them. Unlike the majority's holding, however, it would allocate to the defendants, and not the plaintiff, the task of establishing which particular remains were or were not mistreated during the period of the established pattern or practice.

Petitioners' application for a rehearing was denied January 23, 1992. Arabian, J., did not participate therein. Mosk, J., and Kennard, J., were of the opinion that the application should be granted.