53 Cal.Rptr.3d 668 (2007)
146 Cal.App.4th 1435
Sheila STONE, Plaintiff and Respondent,
v.
CENTER TRUST RETAIL PROPERTIES, INC., Defendant and Appellant.
No. B181180.
Court of Appeal of California, Second District, Division Eight.
January 23, 2007.
*669 Horvitz & Levy, David M. Axelrad and Wendy S. Albers, Encino; Wilson, Elser, Moskowitz, Edelman & Dicker, Steven J. Joffe and J. Walter Gussner, Los Angeles, for Defendant and Appellant.
Ward & Ward and Alexandra S. Ward, San Bernardino; Law Offices of Bruce D. Kordic and Bruce D. Kordic, Los Angeles for Plaintiff and Respondent.
RUBIN, J.
Commercial landlord Center Trust Retail Properties, Inc. appeals from the jury's six-figure damage award to Sheila Stone for the physical injuries she suffered in Center Trust's mall. We reverse and remand for retrial.

FACTS AND PROCEDURAL HISTORY
Appellant Center Trust Retail Properties, Inc. owned a Los Angeles retail mall in which' the Gumboz Creole Cajun restaurant was a tenant. In August 2001, the restaurant defaulted on its rent. Two months Jater, Center Trust served the restaurant with a five-day notice to pay rent or quit, but the restaurant did neither. In November, Center Trust filed an unlawful detainer complaint, and later that month took the restaurant's default. On December 3, 2001, the unlawful detainer court entered a partial judgment for possession by Center Trust, and 10 days later issued a writ of possession. "On or about" December 27, 2001, Center Trust was "restored [to] possession of the premises."
A week and a half later, respondent Sheila Stone hosted a party at the restaurant, which was still operating.[1] During the party, guests danced on a temporary wooden dance floor placed over the carpet. While dancing, Stone slipped on water on the floor and fell, fracturing her ankle. There was enough water to dampen her clothes from her back to her ankle as she lay on the floor, and several witnesses described the carpet next to the floor as "soaked."
Stone's ankle fracture required three operations to repair. While recovering from one of the surgeries, she wore a cast that made walking awkward and fell and broke her wrist, which required two operations to repair. All told, Stone endured five operations and suffers from permanently diminished range of motion and lingering pain.
Stone sued appellant Center Trust and the restaurant's owner for her injuries. Center Trust cross-complained against the owner for indemnity, but he was never served with either Stone's complaint or Center Trust's cross-complaint and was eventually dismissed from the proceedings.
By the parties' agreement, the court bifurcated the liability and damages phases of the trial. At the end of the liability phase, the jury found the restaurant 65 percent responsible for Stone's injuries, Center Trust 19 percent responsible, and Stone herself 16 percent responsible. The trial moved to the damages phase, at the *670 end of which the jury found Stone had suffered $391,000 in economic damages and $300,000 in non-economic damages. Reducing her economic damages by her comparative fault and limiting her noneconomic damages recovery from Center Trust to its percentage of responsibility, the court ordered Center Trust to pay Stone $328,440 in economic damages and $57,000 in non-economic damages. (Civ. Code, § 1431.2) This appeal followed.

DISCUSSION

1. Center Trust's Duties as a Landlord

Center Trust owned the mall in which the restaurant was a tenant. All landowners, including landlords, must use reasonable care to protect people who come onto their property. (Civ.Code, § 1714; CACI 1000, 1001, 1006) For landlords, reasonable care ordinarily involves making sure the property is safe at the beginning of the tenancy, and repairing any hazards the landlord learns about later. As the court explained in Mata v. Mata (2003) 105 Cal.App.4th 1121, 1131-1132, 130 Cal.Rptr.2d 141 disapproved in part on another ground in Delgado v. Trax Bar & Grill (2005) 36 Cal.4th 224, 247-250, 30 Cal.Rptr.3d 145, 113 P.3d 1159.)
"Because a landlord has relinquished possessory interest in the land, his or her duty of care to third parties injured on the land is attenuated as compared with the tenant who enjoys possession and control. Thus, before liability may be thrust on a landlord for a third party's injury due to a dangerous condition on the land, the plaintiff must show that the landlord had actual knowledge of the dangerous condition in question, plus the right and ability to cure the condition."
Limiting a landlord's obligations releases it from needing to engage in potentially intrusive oversight of the property, thus permitting the tenant to enjoy its tenancy unmolested. A landlord's move to evict a defaulting tenant unsettles their relationship, however, requiring a rebalancing of their rights and duties. Stone argued in the trial court that Center Trust's duty of care should have expanded to include inspecting the restaurant, during which it would have discovered a water leak. Center Trust contends nothing should have changed, however, leaving it with no duty to inspect the restaurant or protect its tenant's customers. (Uccello v. Laudenslayer (1975) 44 Cal.App.3d 504, 10, 118 Cal.Rptr. 741 [landlord ordinarily not liable to a tenant's guests and invitees for dangerous conditions which arise on the property after the tenant occupies it]; see also Chee v. Amanda Goldt Property Management (2006) 143 Cal.App.4th 1360, 1373-1374, 50 Cal.Rptr.3d 40; 8 Miller and Starr, Cal. Real Estate (3d ed.2001) § 22:48.) From the jury's verdict for Stone, we infer it found Center Trust had a duty to inspect, which it breached. We conclude the jury correctly found a duty, but the trial got off onto the wrong track because the court did not adequately define that duty's scope.
The court instructed the jury that a landlord must act reasonably to correct defects it knew, or should have known, about. (Christensen v. Superior Court (1991) 54 Cal.3d 868, 885, 2 Cal.Rptr.2d 79, 820 P.2d 181 [duty legal question for court].) The court did not, however, mention any duty to inspect. We conclude it should have instructed such a duty existed during the eviction proceedings. Unlawful detainer actions substitute for a landlord's self-help to avoid, in part, the conflict and possible violence of a landlord trying on its own initiative to physically evict a defaulting tenant. Unlawful detainer suits do not, however, bar contact between a landlord and tenant. Moreover, they do not excuse a landlord's turning a blind eye to *671 conditions on its property. Center Trust knew defaulting tenants sometimes neglected property. Furthermore, Center Trust knew the restaurant was violating its lease by running an after-hours dance club on the premises. Despite knowing of the restaurant's lease violations and aware of possible neglect of the premise's physical condition, Center Trust did not inspect its property.
It is one thing for a landlord to leave a tenant alone who is complying with its lease. It is entirely different, however, for a landlord to ignore a defaulting tenant's possible neglect of property. Neglected property endangers the public, and a landlord's detachment frustrates the public policy of keeping property in good repair and safe. To strike the right balance between safety and disfavored self-help, we hold that Center Trust's duty to inspect attached upon entry of the judgment of possession in the unlawful detainer action and included reasonable periodic inspections thereafter. (Biakanja v. Irving (1958) 49 Cal.2d 647, 650, 320 P.2d 16 [important factors to consider in finding a duty of care are "foreseeability of harm" and "preventing future harm."].) Upon entry of judgment, a tenant's incentive to maintain a property dissipates because continued maintenance likely benefits only the landlord. To protect the public, the incentive to maintain the property must not be an orphan abandoned by a tenant and ignored by a shortly reoccupying landlord. Entry of judgment provides a workable bright line for the parties to know where responsibility lies, and aligns that responsibility with the parties' reordered incentives. (Mora v. Baker Commodities, Inc. (1989) 210 Cal.App.3d 771, 782, 258 Cal.Rptr, 669 ["The burden of reducing or avoiding the risk and the likelihood of injury will affect the determination of what constitutes a reasonable inspection."].)
Not only did Center Trust have the duty to inspect, it had the right. Martinez v. Bank of America (2000) 82 Cal.App.4th 883, 98 Cal.Rptr.2d 576, is instructive. There, the court found that during prosecution of unlawful detainer proceedings, a landlord did not have the right, and therefore had no duty, to inspect property over the tenant's objection. (Martinez, at pp. 894-895, 98 Cal.Rptr.2d 576.) Martinez implies, however, that upon entry of a judgment of possession, the property owner has both the right and duty to inspect. It states, "until a judgment was obtained and satisfied in that unlawful detainer proceeding, the [property owner] did not have the ability to directly and promptly control conditions existing on the ... property occupied by the [tenant]. [Citation.] For that reason, the [property owner] had no duty to [third parties on the property]." (Martinez, at p. 893, 98 Cal.Rptr.2d 576; but see Leakes v. Shamoun (1986) 187 Cal.App.3d 772, 778, 232 Cal.Rptr. 171 [landlord has less control over tenant who is not doing something as basic as paying rent.]) Here, the lease explicitly gave Center Trust the right to inspect if the restaurant defaulted. The eviction proceedings reaffirmed that power and right, and transformed Center Trust from a landlord disinterested about the restaurant's conditions to a landlord on the verge of recovering its property and who could not ignore the possible hazards under its nose.
Center Trust cites decisions that a landlord ordinarily is not liable to a tenant's guests and invitees for dangerous conditions which arise on the property after the tenant occupies it. (Uccello v. Laudenslayer, supra, 44 Cal.App.3d at p. 510, 118 Cal.Rptr. 741; see also Chee v. Amanda Goldt Property Management, supra, 143 Cal.App.4th at pp. 1373-1374, 50 Cal. Rptr.3d 40; 8 Miller and Starr, supra, § 22:48.) Center Trust's status as a landlord *672 with a judgment of possession made it a hybrid, however, lying between the limited duties of a non-possessory landlord and the greater duties of an occupying landowner. Its hybrid status makes inapposite the authorities it cites.
At the time of trial, the parties and the court lacked guidance from case law about the duty to inspect. Accordingly, the parties did not appropriately shape their trial presentations to help the jury pin down the timing of Center Trust's duty to inspect, the nature of any inspections, and whether Center Trust would have discovered the leak during those inspections. We cannot tell from the record at what point from the restaurant's default in August until Stone's accident in January that the jury concluded Center Trust's duty attached. Consequently, the jury might have concluded ("enter Trust should have inspected the property shortly after the restaurant's August default, instead of, as we hold, the entry of the judgment of possession in December. We therefore remand for retrial of the restaurant's and Center Trust's liability only. During retrial, the parties may present evidence whether reasonable inspection upon entry of the judgment and any later inspections would have discovered the leak. The court shall thereafter instruct the jury that Center Trust had a duty to inspect the restaurant upon entry of the judgment and reasonable intervals thereafter. After the jury determines Center Trust's responsibility, if any, for Stone's injuries, the trial court shall recalculate her damage award using the first jury's determination of Stone's total damages in the earlier trial.

2. Economic Damages

Center Trust contends the evidence did not support the amount of Stone's economic damages award. Her economic damages consisted of medical expenses and lost past and future wages. Center Trust does not challenge Stone's lost wages, but contends she offered no evidence that her medical expenses were reasonable. According to Center Trust, Stone's evidence covered only the amount of her bills, but not their medical legitimacy. Center Trust focuses its argument particularly on a $100,214.05 medical services lien filed by San Bernardino County. (Gov.Code, § 23004.1; Civ.Code, § 3045.1) Urging us to disregard the lien as insufficient to establish its own reasonableness by itself, Center Trust asks that; we substantially reduce Stone's recovery in the amount of about $100,000.
We decline Center Trust's invitation because we do not need to rely on the lien to uphold the jury's award. The verdict form stated Stone's economic and non-economic damages, but did not identify her damages with any more detail than those two categories. The form included no special jury findings about different types of economic damages, such as lost wages and medical expenses. Thus, as long as the record supports the total amount of economic damages regardless of whether that evidence related to medical expenses or lost wages, we must affirm that part of the award. (Greer v. Buzgheia (2006) 141 Cal. App.4th 1150, 1158, 46 Cal.Rptr.3d 780.)
Here, the lost wages evidence supported the jury's award. Up to the time of trial, Stone's injuries made her unemployable. Her expert economist calculated her lost past wages as $78,561. He also calculated the present value of lost future income of at least $267,971 if she had worked until she was 62 years old. He explained that he assumed retirement at 62 based on government statistics that showed a woman of Stone's age worked on average only 11 more years. We note, however, that the jury was free to reject the economist's assumption about the number of years *673 Stone had intended to work, particularly given her testimony that she had hoped to work until she was 65. Arithmetic shows that three more working years from age 62 to 65 raises Stone's lost future wages by $73,083. ($267,971 ÷ 11 years equals $24,361 lost annually in future wages; $24,361 x 3 additional working years equals $73,083.) Adding $73,083 for three extra years of lost future wages to $267,971 (11 years lost future wages) and $78,561 (lost past wages) equals $419,615, which is enough to support the economic damages award of $391,000. (We note our discussion does not even include possible future medical expenses of $15,000 to $20,000, which could raise Stone's economic damages even more.)

DISPOSITION
The judgment is reversed and the matter remanded for retrial of liability only. Each side to bear its own costs on appeal.
We concur: COOPER, P.J., and BOLAND, J.
NOTES
[1] The restaurant did not permanently go out of business until sometime between the day after Stone's party and eight days later. Appellant's motion to take evidence or for judicial notice of related facts is denied as unnecessary to a resolution of the appeal.